UNITED STATES of America,
Plaintiff-Appellee,

v.

Charles D. GRIGGS,
Defendant-Appellant.

No. 82–5391.

United States Court of Appeals,
Eleventh Circuit.

July 10, 1984.

Archibald J. Thomas, III, Howard W. Skinner, Asst. Federal Public Defender, Jacksonville, Fla., for defendant-appellant.

Thomas E. Morris, Asst. U.S. Atty., Jacksonville, Fla., for plaintiff-appellee.

Before RONEY and HENDERSON, Circuit Judges, and DYER, Senior Circuit Judge.

PER CURIAM.

Charles Griggs appeals his conviction in the United States District Court for the Middle District of Florida of conspiracy to pass counterfeit money. 18 U.S.C. § 371. On appeal, Griggs contends that the prosecutor impermissibly commented on his election not to testify, that the district court erred in admitting certain hearsay statements and that collateral estoppel bars his reprosecution on the current indictment.

This case comes to us with a fairly complicated procedural history, the explanation of which is central to a complete understanding of Griggs' assignments of error. Griggs was first indicted in May of 1979 on three counts of passing counterfeit money in violation of 18 U.S.C. § 472. Count I charged that on April 20, 1979, Griggs passed fake bills to employees at the Twelve North Restaurant in Jacksonville, Florida. Count II alleged the same offense on the same date but at the Page One Lounge. Finally, in Count III, Griggs is accused of giving an additional bill to another employee of the Page One Lounge.

At the trial, Griggs claimed that in the evening of April 20, 1979, while drinking heavily, he became involved in a game of "liar's poker" with several men he did not know. During the game, one of the players, "Butch" Kirschwing, gave Griggs several counterfeit bills. After the game,

Griggs went out with Kirschwing and spent some of the bills that he had received unwittingly during the course of the earlier poker game. Kirschwing was a fugitive at the time of Griggs' trial, and therefore, he was not available to testify. At the conclusion of the trial, the court directed a verdict for Griggs on Count III and the jury acquitted him on the remaining counts.

Sometime after the first trial, Butch Kirschwing turned himself in to the authorities. He entered into a plea bargain with the government, agreeing to testify against Griggs in return for a reduced sentence. Armed with new evidence in the form of Kirschwing's testimony, the government indicted Griggs on five new charges. Count I alleged conspiracy to pass counterfeit bills and specified thirteen overt acts in support of the charge. Counts II and III alleged that Griggs had sold counterfeit bills to Kirschwing. Count IV charged possession of fake money and Count V accused Griggs with attempting to pass a counterfeit bill at the Page One Lounge.

Griggs moved to dismiss the indictment on collateral estoppel grounds. The district court denied the motion and Griggs filed an interlocutory appeal to the Fifth Circuit Court of Appeals. The court of appeals concluded that the verdicts at Griggs' first trial established (1) that Griggs was unaware that the bills he passed at the Twelve North Restaurant were counterfeit, (2) either that Griggs was unaware of the counterfeit nature of the bill that he passed at the Page One Lounge or the evidence was not sufficient to establish that he was the one that passed it, and (3) the evidence was insufficient to prove that Griggs passed the second bill at Page One. *See United States v. Griggs*, 651 F.2d 396 (5th Cir. Unit B 1981).

The *Griggs* court held that, in view of these facts established in Griggs' previous trial, the government was collaterally estopped from prosecuting Griggs on Count V of the new indictment. The court concluded that although the verdict at the previous trial established only Griggs' lack of knowledge of the counterfeit nature of the bills passed at the Twelve North Restaurant, it was quite unlikely that he gained such knowledge before going to the Page One Lounge. Therefore, as a matter of law, he lacked the requisite knowledge to inculpate him of attempting to pass a counterfeit bill at that establishment.

In compliance with the court of appeals' disposition of the interlocutory appeal, the district court struck Count V and commenced the trial. Griggs elected to exercise his fifth amendment privilege against self-incrimination and declined to testify. The government introduced several incriminating tape recordings of Kirschwing and Griggs discussing their dealings and Kirschwing testified against Griggs as the government's star witness.

I. Prosecutorial Comment on the Exercise of the Fifth Amendment Right.

Griggs' counsel, in both his opening and closing statements, repeatedly tried to discredit Kirschwing. In response to these continual attacks on Kirschwing's veracity and reliability, the prosecutor made the following remarks in his closing argument:

1. There is absolutely no evidence, there is no testimony, not a single person has said Mr. Griggs was afraid of an unjustified conviction. Mr. Thomas [Griggs' attorney] has just asked you to assume that even though the defendant has not testified about it and no one has testified about it.

Record at 426.

2. Now first of all, as to whether Butch is lying. First there is not any testimony at all to the contrary of what Mr. Kirschwing told you.

Record at 429.

3. When you consider all of the evidence, Mr. Kirschwing's testimony and the other testimony, supported on the tape, and the fact that there is no direct testimony against it, we submit you can believe Mr. Kirschwing.

Record at 435.

4. Now we have got Mr. Thomas saying that all that on the tape was just play acting because he is trying to catch Mr.

Kirschwing. I submit to you that is the most far-fetched story of all. There is not a single piece of testimony that gives basis to that argument. It's based only on the stipulations I have read to you, which I have indicated is only what Mr. Thomas told me, not that it is truthful.

Record at 437.

5. The hard concrete, bedrock facts of this case are Kirschwing's testimony, which again there has been no direct testimony in contrary [sic] to, and the tape. . . . [T]he defendant knew that Kirschwing was the only witness with first-hand knowledge that could implicate Mr. Griggs.

Record at 444–45.

6. Only [Griggs] knows where he got the bills to start with, but for him selling them to Mr. Kirschwing none of this would have happened and we wouldn't be here.

Record at 447.

The fifth amendment prohibition against compulsory self-incrimination insures the right of all criminal defendants to decline to testify at trial. U.S. CONST. amend. V. "Concomitant with that right is the prohibition of prosecutorial comment on its exercise." *McGahee v. Massey,* 667 F.2d 1357, 1362 (11th Cir.), *cert. denied,* 459 U.S. 943, 103 S.Ct. 255, 74 L.Ed.2d 199 (1982). *See also Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). Although this general rule is clear that the prosecution must refrain from specific comment on a defendant's exercise of his fifth amendment right, the prohibition is not absolute. "[N]ot every statement that under some conceivable interpretation might draw attention to a defendant's decision not to testify is a comment on silence." *United States v. Berkowitz,* 662 F.2d 1127, 1136 (5th Cir. Unit B 1981).[1] Therefore, it becomes our task to determine when such

comment transcends the bounds of constitutional acceptability.

At times, the prosecutorial ·infirmity is glaringly evident. *See, e.g., United States v. Bates,* 512 F.2d 56, 58 (5th Cir.1975)[2] ("you didn't hear from the culprit"). For the most part, however, the line of demarcation between permissible and constitutionally unacceptable commentary is quite difficult to draw.

In the earlier cases on this subject, the Fifth Circuit Court of Appeals sanctioned comment on the uncontradicted state of the evidence or the defendant's failure "to produce testimony on any phase of the defense on which he relies." *Garcia v. United States,* 315 F.2d 133, 137 (5th Cir.), *cert. denied,* 375 U.S. 855, 84 S.Ct. 117, 11 L.Ed.2d 82 (1963). This expansive language was qualified, however, as "especially true when the evidence against a defendant could be contradicted by someone other than himself." *Id. See also United States v. Jennings,* 527 F.2d 862 (5th Cir.1976).

■ The broad language of *Garcia* and its accompanying limitation eventually evolved into the notion that it is not error "to comment on the failure of the *defense,* as opposed to the *defendant,* to counter or explain the evidence." *United States v. Bright,* 630 F.2d 804, 825 (5th Cir.1980) (emphasis original). *See also United States v. Johnson,* 713 F.2d 633 (11th Cir. 1983) (where defendants chose not to testify at trial but records available to the defense might have existed which would have contradicted the government's theory of the case, prosecutorial comment on the failure of the defense to produce any evidence or testimony in rebuttal to the espoused theory held permissible), *cert. denied,* —— U.S. ——, 104 S.Ct. 1447, 79 L.Ed.2d 766 (1984); *Duncan v. Stynchcombe,* 704 F.2d 1213, 1215 (11th Cir.1983) (prosecutor's comment that "there has been no evidence in this case from the

---

**1.** In *Stein v. Reynolds Securities, Inc.,* 667 F.2d 33, 34 (11th Cir.1982), the Eleventh Circuit Court of Appeals adopted as precedent all decisions of Unit B of the former Fifth Circuit.

**2.** In *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (*en banc*), the Eleventh Circuit Court of Appeals adopted as precedent the decisions of the former Fifth Circuit issued before October 1, 1981.

defense at all that Duncan was not in that house" held a proper reference to the failure of the defense to offer any alibi evidence as to defendant's whereabouts at the time of the crime). Consequently, if there is rebuttal evidence available in addition to the defendant's testimony, this circuit generally will not find error in a reference to the uncontradicted nature of the prosecution's evidence.

The applicability of the *Bright-Stynchcombe-Johnson* doctrine breaks down, however, in cases where the rebuttal testimony or evidence could come only from the defendant. Then, a failure of the *defense* to present evidence is equivalent to the failure of the *defendant* to testify. This is the situation here.

■ In *United States v. Stuart-Caballero*, 686 F.2d 890, 892 (11th Cir.1982), *cert. denied*, 459 U.S. 1209, 103 S.Ct. 1202, 75 L.Ed.2d 444 (1983), our court adopted an alternative test to evaluate comment on the defendant's failure to testify in instances where he alone could provide contradictory evidence. Prosecutorial comment is improper if the defense can demonstrate either that "(1) the prosecutor manifestly intended to comment on the defendant's silence, or (2) the character of the comment was such that a jury would naturally and necessarily construe it as a comment on the defendant's silence." *Id.* at 892.

■ To begin our determination of the propriety of the remarks in question here, we turn first to an analysis of each comment under the "prosecutorial intent" prong of the *Stuart-Caballero* test. No manifest intent to comment is demonstrated if there exists another, equally plausible explanation for the remark. *See United States v. Rochan*, 563 F.2d 1246, 1249 (5th Cir.1977). For example, when it is "very possible" that the comment stemmed from mere inadvertence, there is no error. *See Samuels v. United States*, 398 F.2d 964, 968 (5th Cir.1968), *cert. denied*, 393 U.S. 1021, 89 S.Ct. 630, 21 L.Ed.2d 566 (1969). Similarly, there is no infirmity when the comment is offered to rebut a defense attack on a prosecution witness' credibility.

*See Williams v. Wainwright*, 673 F.2d 1182 (11th Cir.1982).

In *Williams*, the defendant was charged with armed robbery, an element of which is force. The prosecution planned to put the victim on the stand to testify to the use of force. The only person available who could dispute this assertion was the defendant, who chose not to testify. Nonetheless, in his opening statement, the defense counsel promised the jury that he would discredit the victim's testimony on cross-examination.

As planned, the victim testified to the defendant's use of force and underwent vigorous cross-examination. In closing, the prosecution pointed out that the evidence of force remained uncontradicted. The defense objected to this statement as a reference to the defendant's failure to take the stand. The court found, however, that the remark was intended only to rebut the defense's claim that the witness was incredible and highlight the fact that her testimony remained steadfast after cross-examination.

■ The bulk of the remarks to which Griggs objects fall into the rebuttal category. In his opening statement, the defense called Kirschwing a liar outright. *See* record at Vol. 7, pp. 51–59. Comments two, three and five simply respond to this and other attacks and represent attempts to reassert Kirschwing's credibility after denigration by the defense. In view of the factual similarity of the context in which these three remarks were made to that found in *Williams*, we conclude that these three comments constitute permissible rebuttal argument by the prosecution.

Acceptable rebuttal commentary may take other forms as well. For example in *United States v. Hartley*, 678 F.2d 961 (11th Cir.1982), *cert. denied*, 459 U.S. 1170, 103 S.Ct. 815, 74 L.Ed.2d 1014 (1983), in its opening statement, the defense attorney promised that he would show various facts favorable to his client's case. In closing, the prosecution stated: "I don't recall any testimony about that.... Certainly none

of them testified about that." *Id.* at 983. The *Hartley* court found both that these remarks were neither intended to be a comment on the defendant's silence, nor would the jury view them in such a fashion. The prosecutor's statements merely pointed out the fact that defense counsel made certain bold allegations in his opening statement that were unsubstantiated by the evidence.

The validity of prosecutorial rebuttal in the face of unsupported defense claims is also well-illustrated by the decision of *United States v. Freeman,* 660 F.2d 1030 (5th Cir. Unit B 1981), *cert. denied,* 459 U.S. 823, 103 S.Ct. 54, 74 L.Ed.2d 59 (1982). In *Freeman,* the appellants were charged with conspiring to import marijuana, largely because of their presence on the transport vessel. In his opening statement, the defense counsel claimed that his clients were basically innocent bystanders, whereas the government reasoned that, had they been innocent, they would have mutinied against the ship's captain.

After their lawyers argued that the defendants were coerced into participation, the prosecution stated: "You haven't heard any evidence of coercion." *Id.* at 1037. Upon objection, the court held that "[t]he prosecutor's comments are a comment on the failure to establish a coercion theory. As such, it is proper rebuttal." *Id.*

The doctrine espoused by the *Freeman* and *Hartley* courts operates as a check on allowing non-testifying defendants to testify through their attorneys. A defendant may choose to exercise his fifth amendment rights but once he does, he cannot then inject bold, unsubstantiated conclusions into the trial. The prosecution must be free to remind the jury that unsupported defense allegations by lawyers are not evidence.

The *Hartley* and *Freeman* decisions are quite pertinent to our evaluation of the first and fourth comments challenged by Griggs. In his opening statement, Griggs' attorney claimed that Griggs warned Kirschwing to lay low, merely because he was afraid of guilt by association, not because he was guilty of any crime. No

evidence ever was presented to confirm this bare claim. We conclude that the prosecutor's first comment was intended merely to rebut this unsupported assertion. Similarly, Griggs' counsel alleged that Griggs acquiesced in the counterfeit bill scheme solely to trap Kirschwing for the government. Because the defense provided no evidence to prove this allegation either, it is a fair ground for rebuttal commentary by the government.

Finally, we conclude that the prosecutor's apparent motive in making the last comment to which Griggs objects was proper as well. The prosecution is entitled to refer to the fact that the defense has failed to rebut a natural inference that may be drawn from the facts in evidence. For example, in *United States v. Ward,* 552 F.2d 1080 (5th Cir.), *cert. denied,* 434 U.S. 850, 98 S.Ct. 161, 54 L.Ed.2d 119 (1977), the defendant was charged with the theft of a brand new, stolen tractor that was found in his possession at the time of his capture. Because the defendant did not testify, the origin of the tractor was unknown. The prosecution argued: "Now where did he get it? Well only he knows where he got it. We don't know. I don't know where he got it. You don't know where he got it." *Id.* at 1083 (emphasis omitted). In response to a fifth amendment challenge, the *Ward* court held that the prosecution's statements were a permissible reference to the fact that the defense never rebutted the natural inference that one in possession of stolen property either purchased it innocently or may very well have stolen it.

Comment six is factually quite similar to *Ward.* It is possible that Griggs obtained the counterfeit bills unwittingly in a poker game or knowingly through illegal means. The prosecutor's final comment simply points out that there was no evidence presented to support Griggs' exculpatory theory.

From the above discussion it is apparent that the prosecutor in this case had no manifest intent to comment on Griggs' fail-

ure to testify.[3] Our inquiry does not end here, however. The second part of the *Stuart-Caballero* test requires an inquiry into whether the jury perceived the comments in an impermissible way.

■ The standard for decision under the second prong of the *Stuart-Caballero* test is not whether the "jury possibly or even probably would view the challenged remark in this manner but whether the jury *necessarily* would have done so." *Williams v. Wainwright,* 673 F.2d 1182, 1185 (11th Cir.1982) (emphasis original). Additionally, the notion that the courts traditionally have been quite "slow to find a necessarily improper understanding on the part of the jury" *United States v. Rochan,* 563 F.2d 1246, 1250 (5th Cir.1977), militates in favor of the validity of the prosecutor's words. In light of these qualifications on the application of the second prong of the *Stuart-Caballero* test, we conclude that the jury would not have construed any of remarks two through six to be a comment on Griggs' failure to testify. Moreover, we note that the defense failed to object to any of these comments at trial. Therefore, we can hold these remarks to be error only if we deem them "so grossly prejudicial that the harm could not be removed by objections or instructions." *United States v. Harbin,* 601 F.2d 773, 776 n. 2 (5th Cir.), *cert. denied,* 444 U.S. 954, 100 S.Ct. 433, 62 L.Ed.2d 327 (1979), (quoting *Benham v. United States,* 215 F.2d 472, 473 (5th Cir. 1954)). Since those five comments do not require reversal, even when evaluated under the usual standard of review, it is quite clear that they are not infirm under the heightened level of scrutiny necessitated by a failure to object.

Although we readily uphold the last five comments under the scrutiny of the second part of the *Stuart-Caballero* test, the first remark to which Griggs protests is far more troublesome. Griggs' counsel registered a timely objection to the statement.

Therefore we judge it by asking whether the jury necessarily would have understood it to refer to Griggs' silence.

■ After careful consideration, we conclude that the phrase, "the defendant has not testified about it" is an unmistakable reference to Griggs' exercise of his fifth amendment privilege. The jury could not have failed to comprehend the remark in any other way. Because this statement infringes on Griggs' constitutional rights, we must reverse his conviction. Since a new trial would involve the other two issues which Griggs raises on this appeal, we examine those contentions as well.

## II. Admission of Co-Conspirator's statements

At one point during the trial, Lynn Sanderson, a co-conspirator took the stand and testified that Griggs came to visit her and Kirschwing while they were "hiding out" at a fishing camp. Although Sanderson did not personally see or speak to Griggs, she testified that Kirschwing told her that Griggs had warned him to "lay low" for a while.

The government, on the other hand, contended that the evidence was admissible under Rule 801(d)(2)(E) of the Federal Rules of Evidence. Griggs objected to this testimony as hearsay. In response to the objection, the district court conducted a hearing pursuant to *United States v. James,* 590 F.2d 575 (5th Cir.) (*en banc*), *cert. denied,* 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979) to determine the admissibility of the statements.

■ Admissibility under Rule 801(d)(2)(E) is conditioned upon a showing by the government that the statement was made by a co-conspirator during and in the furtherance of the conspiracy. Statements made after the cessation of the primary purpose of the conspiracy that served only to conceal the conspiracy are not protected

---

**3.** We note the clear judicial preference toward construing the prosecutor's motive as a permissible one. We caution, however, that, although individually, each comment may stem from a proper motive, in excessive cases, the sheer volume of such comments may warrant a finding of bad motive.

by the Rule. *See Grunewald v. United States*, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957); *Lutwak v. United States*, 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593 (1953); *Krulewitch v. United States*, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1949). Griggs urges that the conspiracy ended prior to his arrival at the fishing camp, thereby excepting Sanderson's testimony from admission under Rule 801(d)(2)(E).

■ At the *James* hearing the district court held that, at the time of Griggs' visit, the conspiracy had not yet ended so that the statements were not made solely for purposes of concealment. We may overturn this finding only if clearly erroneous. *See United States v. Roper*, 681 F.2d 1354, 1359 (11th Cir.1982), *cert. denied*, 459 U.S. 1207, 103 S.Ct. 1197, 75 L.Ed.2d 440 (1983). Contrary to Griggs' assertions, we believe that the district court's ruling was correct.

"[C]oncealment is sometimes a necessary part of a conspiracy, so that statements made solely to aid the concealment are in fact made during and in furtherance of the charged conspiracy." *United States v. Del Valle*, 587 F.2d 699, 704 (5th Cir.), *cert. denied*, 442 U.S. 909, 99 S.Ct. 2822, 61 L.Ed.2d 274 (1979). This is particularly true in cases such as this one in which the object of the conspiracy—to pass and attempt to pass counterfeit money—was not insular but continuous. *Compare Forman v. United States*, 361 U.S. 416, 80 S.Ct. 481, 4 L.Ed.2d 412 (1960) (continuing scheme of tax evasion); *United States v. Del Valle*, 587 F.2d 699 (5th Cir.) (insurance fraud), *cert. denied*, 442 U.S. 909, 99 S.Ct. 2822, 61 L.Ed.2d 274 (1979); *United States v. Diez*, 515 F.2d 892 (5th Cir.1975) (scheme of tax fraud through real estate transactions), *cert. denied*, 423 U.S. 1052, 96 S.Ct. 780, 46 L.Ed.2d 641 (1976); *with Lutwak v. United States*, 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593 (1953) (conspiracy to avoid immigration law with sham marriage).

The district court's finding that the conspiracy had not yet ended is supported by Griggs' taped admission that in August of 1979, several months after the conversation with Kirschwing at the fishing camp, he went back to the wooded area where he previously had thrown counterfeit money out of his car and tried unsuccessfully to relocate it. *See* transcript of Griggs-Kirschwing conversation, exhibit 8c at 12. That he was unable to regain the counterfeit currency is irrelevant to the fact that the underlying purpose of the conspiracy had not terminated as late as August of 1979. In view of this finding that, although presently inactive, the goal of the conspiracy had not yet terminated completely, the district court correctly admitted Sanderson's testimony.

■ While we uphold the district court's evidentiary ruling that the conspiracy was still in progress at the time of Griggs' visit to the fishing camp, we note that it is sustainable on other grounds, specifically Rule 801(d)(1)(B) of the Federal Rules of Evidence.[4] The case of *United States v. Zuniga-Lara*, 570 F.2d 1286 (5th Cir.), *cert. denied*, 436 U.S. 961, 98 S.Ct. 3080, 57 L.Ed.2d 1128 (1978), illustrates the applicability of this part of Rule 801 to the instant facts. In that case, Zuniga-Lara asked Corrections Officer Costello to "[t]ell me who fingered me." Costello then related this episode to Officer Viel. At trial, Costello testified to Zuniga-Lara's question to him and was cross-examined vigorously by the defense in an attempt to discredit him. Subsequently, Viel testified to what Costello told him of his conversation with Zuniga-Lara. Over objection, the court admitted Viel's testimony as being non-hear-

---

**4.** Rule 801(d)(1)(B) provides as follows:
   **Statements which are not hearsay. A statement is not hearsay if**
   (1) **Prior statement by witness.** The declarant testifies at the trial or hearing and is subject to cross examination concerning the statement, and the statement is
   (B) consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive ....

say since the declarant, Costello, had testified at trial, been subjected to cross examination and an attack on his credibility, thereby satisfying all the prerequisites for admissibility under Rule 801(d)(1)(B).

We face an analogous fact situation here. Griggs made several statements to Kirschwing which Kirschwing related to Sanderson. Kirschwing, the declarant, testified at the trial. It is clear that his veracity was under attack continuously throughout all phases of the proceedings since discrediting Kirschwing was the primary goal of Griggs' defense. Accordingly, the trial court correctly admitted Sanderson's testimony under Rule 801(d)(1)(B) [5] as well as Rule 801(d)(2)(E).

### III. Collateral Estoppel

As his final ground of appeal, Griggs claims that the doctrine of collateral estoppel prohibited the relitigation of the issues charged in overt acts nine and ten of the instant indictment.[6] Collateral estoppel may apply in either of two ways. It may "bar the introduction or argumentation of certain facts necessarily established in a prior proceeding," *United States v. Lee*, 622 F.2d 787, 790 (5th Cir.1980), *cert. denied*, 451 U.S. 913, 101 S.Ct. 1987, 68 L.Ed.2d 303 (1981), or "it may completely bar a subsequent prosecution where one of the facts necessarily determined in the former trial is an essential element to the

conviction the Government now seeks." *Id.*

The first step in analyzing a collateral estoppel claim is to identify the facts that were determined in the former judicial proceeding. Only those facts which *necessarily* were determined previously are prohibited from re-examination at the subsequent trial. *Id.*

In the former appellate appearance of this case, the Fifth Circuit Court of Appeals entertained an assignment of error that Griggs' acquittal in the first trial prevented his reprosecution in the second. *See United States v. Griggs*, 651 F.2d 396 (5th Cir. Unit B 1981). The court agreed with this contention to a limited extent, concluding that collateral estoppel precluded Griggs' retrial on Count Five [7] of the indictment. In so doing, the court determined that the following three facts necessarily must have been determined at the first trial: (1) Griggs was unaware that the bills he passed at the Twelve North Restaurant were counterfeit; (2) Griggs either did not know that the bill he passed at the Page One Lounge was counterfeit or the evidence was insufficient to prove that he passed it, and (3) the evidence was insufficient to establish that he passed the third counterfeit bill at the Page One.

The only one of these facts which may be relevant to this appeal is the *Griggs* court's finding that Griggs was unaware of the

---

**5.** Although the district court did not address the admissibility of Sanderson's testimony on these alternative grounds, this does not prevent this court from entertaining them on appeal. *See California Bankers Ass'n v. Shultz*, 416 U.S. 21, 94 S.Ct. 1494, 39 L.Ed.2d 812 (1974) (parties are free on appeal to urge reasons for affirming the district court's judgment even though such grounds were not relied on by the district court).

**6.** The indictment reads in pertinent part as follows:

9. On or about April 24, 1979, Charles D. Griggs warned Frederick Allen Kirschwing that law enforcement authorities might be seeking Griggs in connection with counterfeit bills passed April 20, 1979, and urged Kirschwing to destroy any remaining counterfeit bills he possessed and to lie low or leave town.

10. On or about April 24, 1979, Charles D. Griggs told Frederick Allen Kirschwing that if interviewed by law enforcement officials he should indicate he had won some $50 bills playing liar's poker at the White Lion Tavern in St. Augustine.

**7.** Count V of the indictment charged:

On or about the 20th day of April, 1979, in the Middle District of Florida,

CHARLES D. GRIGGS

with intent to defraud, did attempt to pass and utter to Barbara Rhodes at the Page One Lounge, Jacksonville, Florida, a forged and counterfeited obligation of the United States, that is, a Federal Reserve Note in the denomination of $50, and he then knew said note to be forged and counterfeited, all in violation of 18, United States Code, § 472.

counterfeit nature of the bill he passed at the Twelve North Restaurant on April 20, 1979. Griggs contends that the government is trying to relitigate this question indirectly through proof of overt acts nine and ten. He asserts that, unless he knew that the bills passed on April 20, 1979 were counterfeit, he would have had no reason either to warn Kirschwing on April 24, 1979 that the police might be seeking Griggs for passing counterfeit bills, or urge Kirschwing to explain that he had won the bills at a liar's poker game. Therefore, to permit evidence about these two overt acts would be indirect relitigation of his knowledge on April 20, 1979.

This contention is without support. The first trial established only that Griggs was unaware of the counterfeit nature of the bills that he had in his possession at one restaurant on one particular evening. Griggs very well may have known of the existence of counterfeit bills prior and subsequent to that evening and just have been unaware that those that he sold that evening were fraudulent.

This conclusion is perfectly consistent with the evidence. At Griggs' first trial, he contended that he won the phoney money from Kirschwing in a liar's poker game. At the second trial, Kirschwing maintained that he obtained the forged bills from Griggs. The second jury very well could have believed that Griggs sold the bills to Kirschwing and then Kirschwing used them to play poker, passing them to Griggs without his knowledge. This way, Griggs could have been involved in the counterfeit scheme as Kirschwing maintains and still have been unaware that the bills were counterfeit when he passed them at the restaurant. Later, he might have been told by Kirschwing that the money he spent was counterfeit or realized this himself after being alerted by a restaurant employee, thereby accounting for his warnings to Kirschwing.

The above scenario illustrates that proof of overt acts nine and ten was not necessarily precluded by the prior determination that Griggs' actions on the single evening

of April 20, 1979 were innocent. Therefore, the offer of substantive proof of these offenses was not erroneous.

In summary, we REVERSE Griggs' conviction because of the prosecutor's improper reference to Griggs' failure to testify, but find no error in the other two points raised on this appeal.

REVERSED.