[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
September 2, 2005
THOMAS K. KAHN
CLERK

No. 05-10709
Non-Argument Calendar
_____

D. C. Docket No. 04-20322-CR-ASG

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

PEDRO MARTINEZ,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(September 2, 2005)**

Before CARNES, MARCUS and FAY, Circuit Judges.

PER CURIAM:

Pedro Martinez appeals his conviction for using the mail to communicate a bomb threat in violation of 18 U.S.C. § 844(e). He argues that his right to due process and a fair trial were violated as the result of prosecutorial misconduct during the government's closing statement. For the reasons stated more fully below, we affirm Martinez's conviction.

A federal grand jury returned an indictment charging Martinez with using the mail to maliciously convey false information concerning an attempt to unlawfully destroy a building, a courthouse in Miami, Florida, by means of fire and explosives on or about March 24, 2003. He pled not guilty and proceeded to trial, where a jury found him guilty. Martinez was subsequently sentenced to 120 months' imprisonment.

At trial, the government presented the testimony of Christina Pharo, a United States Marshal for the Southern District of Florida, who, on March 26, 2003, was the supervisor in charge of court security for the district. That day, Pharo, whose last name at the time was Fernandez, received and read a letter addressed to "Katherine Fernandez," written in Spanish, and containing a bomb threat. The contents of the letter, translated into English, were as follows:

> Terrorism in Miami, urgent, okay. You be kill in 24 hour, okay.
> March 13, 2003, to the States Attorney, Katherine Fernandez: Hi. I
> am notifying you that the Court in Miami has 24 hour to give an order
> to the president to stop everything, this war with Iraq. If he does not

stop all this in 24 hour, I will explode the bombs that I have placed in the court and at the police. I am military soldier from Iraq and I only wait the order from the chief. And I also want a million to this address with this name: Lisankiy Noda, 2653 Southwest 28 Avenue, Miami, Florida, 33133. She waits for that money. Urgent. Please okay. Send to Lisankiy. If I do not receive the money, I will explode the bombs. Okay. I am terrorist. Only 24 hour for all this and nobody can know anything about this. This is secret and urgent and I also have people in Court in Tampa who are from Gomez Street, Angelina L. Martin, 3603 North Gomez Avenue, Tampa, Florida, 33607. We only wait for you. This is urgent. Lisankiy and Angelina, please send it to me urgent. I explode the courts. Okay.

Notably, the envelope of the letter was postmarked in Lakeland, Florida, and did not contain a return address or marking indicating that it had been mailed from a correctional institute. The letter was subsequently forwarded to the Federal Bureau of Investigation (FBI).

Next, FBI Agent Angel Martinez, who works for the Joint Terrorism Task force, testified that he was involved in the investigation of the letter and, as part of the investigation, attempted to locate Lisankiy Noda and Angelina Martin for interviews regarding the letter. Within 24 hours of receiving the letter, Martinez located Noda, who mentioned that the address on the letter was an old address and that her husband previously had corresponded with the defendant. Agent Martinez interviewed Noda's husband, Javier Gonzalez, who turned over some letters written by the defendant. Agent Martinez, upon viewing the letters written to the Gonzalezes, believed that the handwriting from the March 26, 2003, letter matched

3

the handwriting in the Gonzalez' letters, but sent the samples to the FBI laboratory in Quantico to get confirmation. The March 26, 2003, letter was also sent to the FBI laboratory to extract any latent fingerprints. Noda and Gonzalez were also in possession of a photograph of the defendant.

Agent Martinez also spoke with Angelina Martin, who he learned was the defendant's daughter. Based on the interviews, Agent Martinez conducted an interview of the defendant at the Hardee Correctional State Institution, and before any questions had been asked, the defendant issued the following statement:

> Are you here because of something with the Gonzalez family? Is it about a letter that was sent to the courts in Miami? If it is, then it was my daughter who did it. She is working with a girl named Lisankiy Noda, and she told me she was going to send a letter. I don't know anything about a letter. I am sorry. I know you came a long way from Miami, but I can't help you. I have not seen my daughter in a long time and the only person who visits me is an older, religious lady who lives 20 minutes away near Lakeland.

Later, Agent Martinez returned to visit the defendant in order to take "major case file" fingerprints at the request of the FBI fingerprinting expert at Quantico. At that time, the defendant was read his Miranda warnings, and when told that the FBI was there to investigate a threat letter sent to the courts in Miami, the defendant responded: "Oh, that's what you're talking about. Yes, I sent the letter as a warning."

However, Agent Martinez also reviewed the mail prison logs and they

4

contained no record of the March 26, 2003, letter being sent and, moreover, learned that the standard operating procedure at the prison housing the defendant was not to mail any letter without a return address, which the March 26 letter did not have. He also learned that the defendant had not, according to visitor logs, had any visitors in approximately four years. Agent Martinez did not check the prison commissary to determine what type of envelopes, paper, or pens are sold there, nor did he attempt to extract DNA evidence from the envelope used in the March 26 letter, despite knowing that such evidence may have been available. Martinez explained that he felt the evidence the FBI had acquired was sufficient enough and DNA testing would not have been worth the cost.

The defendant's daughter, Angelina Martin, testified that she never discussed with her father any of the things discussed in the March 26 letter, nor had she spoken with her father for several years. She did not know, nor had ever met, Lisankiy Noda. As for the "Gomez Street" listed in the letter, Martin testified that her grandparents used to reside on Gomez Street, and that's where her father used to send her letters. The government also called the defendant's ex-wife, who was married to the defendant for 10 years. She testified from personal observation and past experience that the defendant's handwriting appeared on the threat letter and several other handwriting examples in the government's possession.

5

The government also called an FBI document expert, who testified that, after comparing the threat letter with the government's handwriting samples, she was able to determine that the writer of the threat letter and the writer of the samples was the same author. An FBI latent fingerprint expert then testified that, after comparing the latent prints on the envelope of the letter at issue with the known latent print of the defendant, she concluded that the fingerprints on the envelope matched those of Martinez, although she could not determine when the print was made. Finally, the government proffered, pursuant to Fed.R.Evid. 404(b), a Florida state judgment and conviction indicating that Martinez had previously pled nolo contendere to a charge of composing a letter containing a false bomb threat.

Martinez chose not to testify on his own behalf and called as his only witness Jim Tridico, a regional assistant warden for operations in the Florida Department of Corrections. Tridico testified regarding the rules governing inmate mail procedures, indicating that, when an inmate mails something from the prison, the mail must be stamped as coming from a state correctional facility, must have an inmate's return address, and must include an inmate's name and inmate number. All mail leaving the prison is checked and read to ensure that it does not include such things as threats of physical harm, blackmail, or extortion. For that reason, all outgoing mail must be presented, unsealed, to corrections staff to ensure that the

6

mail does not include a threat or other prohibited content.  However, on cross examination, Tridico indicated that the rules were not always followed and that it was possible for an inmate to send things out of the prison through visitors, attorneys, or even staff.

During its closing argument, the government summarized the evidence and indicated to the jury that it would be permitted to find Martinez guilty under an "aiding and abetting" instruction.  In response, Martinez argued that the government had failed to prove how the letter in question had been mailed because the envelope failed to include Martinez's return address or inmate identification number as required by prison regulations, in contrast to earlier letters he had mailed to Lisankiy Noda.  He admitted that his palm print appeared on the envelope, but argued that it didn't prove that he wrote on the envelope nor did it explain how every pertinent mail procedure for inmates had been violated. Martinez also attacked the handwriting analysis and comparisons, arguing that the government's evidence was flawed and subject to large fluctuations in accuracy. Next, Martinez argued that there were "plenty of other things out there . . . which could have been presented to you by the parties with the burden of proof, by the parties that have the responsibility handed to them by the Government of the United States to present a case to you, to investigate a case, to present you with

evidence." Specifically, he argued that the government could have, but did not, procure, investigate, or present at trial, evidence including mail logs showing where and when Martinez had mailed letters, the phone records showing who he had called, the identity of the "mystery Lakeland friend," or a DNA sample to determine who licked the envelope. In sum, Martinez argued that the government's case was based on speculation and that it could not prove how the letter at issue had left the prison or Martinez's motive for committing the crime.

The government offered a rebuttal, and commented on the defense's argument that the government could have ascertained the identity of the "Lakeland friend":

> And this thing about, "Well, who's the friend? Who's the friend in Lakeland?" We don't know who the friend is. Angel Martinez doesn't know who the friend is. There's only one person who knows who the friend is. And, remember, they chose to present a case. They presented a case. They presented a witness. That was their answer to the evidence presented was to present a case right over there from the witness stand. And then they come up here . . . and say[], "Well, where are the logs? Where are the phone logs from the prison? Where are the visitor logs from the prison?" They presented a guy from the Department of Corrections with records from the prison.

At this point, Martinez objected on burden shifting grounds, which the district court overruled, stating only "[f]air comment." The government continued:

> They have no obligation to present evidence, but they chose to present a defense and they could have done so. We don't have a monopoly on all of the evidence in the world. And that goes for other issues, too.

8

When they bring up things like, "Well, there's another fingerprint on there. They could have tested it." Of course, we've already got his palm print on the envelope and there's a fingerprint on the envelope as well. But that's [the defense attorney's] job. It's never enough. . . . We got a palm print. We got positive handwriting. We got a confession. We got him doing the same thing in '93. . . . But, no, that's not enough. They did a lousy investigation. They didn't do it properly. They don't care. . . . You know, if we brought in the DNA evidence in a case . . . it's not enough. Bring in the other fingerprint. Not enough. You bring in the handwriting. No, handwriting, it's voodoo. It's a bunch of nonsense. It's not a science. It's not an art. It's nothing. It's not enough. If we brought you a videotape of this guy doing it, he'd be up here, standing here saying, "Where's the live action?"

Martinez's counsel again objected, this time arguing that the government was "denigrating." The court sustained the objection, stating: "I think it's a little far afield. I'm going to ask the jury to ignore that last argument." The jury was then instructed regarding the burden of proof, the equal weight to be given to direct and circumstantial evidence, and told that anything said by the lawyers during the case was not evidence. It was instructed that the defendant was presumed innocent and was not required to prove his innocence or produce evidence and that the defendant's decision not to testify should not be considered during deliberations. Finally, the jury was instructed that it could find the defendant guilty if he willfully aided and abetted the criminal conduct of an associate. The jury found Martinez guilty. He was subsequently sentenced to 120 months' imprisonment.

On appeal, Martinez argues that the cumulative effect of the prosecutor's

9

comments deprived him of his right to due process and a fair trial. Specifically, Martinez argues that the prosecutor's rebuttal comments impermissibly amounted to a burden shifting argument that the district court expressly permitted over his objection, resulting in prejudice. Martinez further argues that it was permissible for him to challenge the inconsistencies between the evidence and the government's theory of the case and the failure of the government to offer proof of an accomplice. Thus, he argues that he did not "open the door" to the government's burden shifting comment. Lastly, he argues that the prosecutor made an implied comment regarding Martinez's failure to testify when it stated that only one person knows who the "Lakeland friend" is, and later, denigrated defense counsel when stating that no amount of evidence would be enough for defense counsel. Based on the foregoing, Martinez argues that the prosecutor's improper remarks, taken together, violated his Fifth and Sixth Amendment rights requiring a new trial.

Generally, claims of prosecutorial misconduct involve mixed questions of law and fact and, therefore, are reviewed de novo. United States v. Noriega, 117 F.3d 1206, 1218 (11th Cir. 1997). "Prosecutorial misconduct requires a new trial only if we find the remarks (1) were improper and (2) prejudiced the defendant's substantive rights." United States v. Hernandez, 145 F.3d 1433, 1438 (11th Cir.

1998). Prosecutorial misconduct is a basis for reversing an appellant's conviction only if, in the context of the entire trial and in light of any curative instruction, the misconduct may have prejudiced the substantial rights of the accused. United States v. Cordoba-Mosquera, 212 F.3d 1194, 1198 (11th Cir. 2000). "This court gives 'considerable weight to the district court's assessment of the prejudicial effect of the prosecutor's remarks and conduct.'" Id. (internal citation omitted).

## I. Burden Shifting

Turning first to the first comment that Martinez's attorney found objectionable, regarding the shifting of the burden, this Court has held that "while a prosecutor may not comment about the absence of witnesses or otherwise attempt to shift the burden of proof, it is not improper for a prosecutor to note that the defendant has the same subpoena powers as the government, 'particularly when done in response to a defendant's argument about the prosecutor's failure to call a specific witness.'" Hernandez, 145 F.3d at 1439; see also United States v. Smith, 918 F.2d 1551, 1562 (11th Cir. 1990) ("[w]hen the prosecutor goes no further than to take defense counsel up on his invitation [to protest to the contrary], his conduct will not be regarded as impermissibly calculated to incite the passions of the jury."). Moreover, a comment by the prosecutor on the failure by defense counsel, as opposed to the defendant, to counter or explain evidence does not violate a

11

defendant's Fifth Amendment right not to testify.  Hernandez, 145 F.3d at 1439.

Here, the defense argued that there were "plenty of other things out there . . . which could have been presented to you by the parties with the burden of proof, by the parties that have the responsibility handed to them by the Government of the United States to present a case to you, to investigate a case, to present you with evidence."  Among the things that Martinez's defense believed were not presented by the government were mail logs and phone records showing Martinez's mailings and outside contacts, as well as the identity of the "mystery Lakeland friend."

In rebuttal, the government's response was:

And, remember, they chose to present a case.  They presented a case. They presented a witness.  That was their answer to the evidence presented was to present a case right over there from the witness stand.  And then they come up here, and [defense counsel] comes up here and says, "Well, where are the logs? Where are the phone logs from the prison? Where are the visitor logs from the prison?" They presented a guy from the Department of Corrections with records from the prison.  They could have done so, folks.  They have no obligation to present evidence, but they chose to present a defense and they could have done so.  We don't have a monopoly on all of the evidence in the world.

Here, the defense argued that the government had failed to produce certain evidence available to it, and the prosecutor's rebuttal, while arguably inartful, was that the defense could have presented the same evidence if it thought that it would be compelling and refuted the government's theory of the case.  We conclude that

12

this was not an improper statement as the defense, while entitled to make its argument, invited the prosecutor's response. See, e.g., Hernandez, 145 F.3d at 1439 ("it is not improper for a prosecutor to note that the defendant has the same subpoena powers as the government, 'particularly when done in response to a defendant's argument about the prosecutor's failure to call a specific witness.'"). Furthermore, any possible prejudice was removed by the government's statement that the defense did not have an obligation to present evidence and the district court's instruction to the jury regarding the government's burden of proof, the presumption of innocence, and the court's statement that "the law does not require a defendant to prove innocence or to produce any evidence at all." See United States v. Simon, 964 F.2d 1082, 1087 (11th Cir. 1992) ("[a] curative instruction purges the taint of a prejudicial remark because the jury is presumed to follow jury instructions. . . . [T]he prejudice from the comments of a prosecutor which may result in a shifting of the burden of proof can be cured by a court's instruction regarding the burden of proof.") (internal citations omitted).

## II. Martinez's Failure to Testify

With regard to Martinez's argument regarding his failure to testify, ordinarily "[a] reviewing court will review the trial judge's determination of whether manifest intent was present under the abuse of discretion standard.

13

Moreover, the remark must be examined in the context in which it was made." United States v. Calderon, 127 F.3d 1314, 1338 (11th Cir. 1997). However, where, as here, no timely objection was made to the prosecutor's allegedly impermissible comment on a defendant's right not to testify, we will review for plain error only. United States v. Abraham, 386 F.3d 1033, 1036 (11th Cir. 2004). We will only correct plain error if an appellant demonstrates (1) an error, (2) that is plain, (3) that affects the substantial rights of the defendant, and (4) that, if left uncorrected, would seriously affect the fairness, integrity, or public reputation of a judicial proceeding. Id. n.1.

"The test for determining whether a prosecutor's remark constitutes an impermissible comment on a defendant's failure to testify is whether 'the statement was manifestly intended or was of such character that a jury would naturally and necessarily take it to be a comment on the failure of the accused to testify.'" United States v. Carter, 760 F.2d 1568, 1578 (11th Cir. 1985) (quotation omitted). "To prevail on this claim, appellant bears the burden of establishing one of the two criteria set forth in this test." Id. "The second part of the test requires a determination of whether the jury would naturally and necessarily take the statement to be a comment on [the defendant's] failure to testify. '[T]he question is not whether the jury possibly or even probably would view the remark in this

14

manner, but whether the jury necessarily would have done so.'" Id. Moreover,

where no objection was lodged, we can find error only where the comment is so

"grossly prejudicial that the harm could not be removed by objections or

instructions." United States v. Griggs, 735 F.2d 1318, 1324 (11th Cir. 1984).

The comment challenged on appeal is as follows:

And this thing about, "Well, who's the friend? Who's the friend in
Lakeland?" We don't know who the friend is. Angel Martinez
doesn't know who the friend is. There's only one person who knows
who the friend is.

As the government concedes, this comment "would have better been left unsaid.

However, the comment was an isolated one, made in the context of rebutting the

defense's argument that the government had access to and failed to produce certain

evidence, in this comment, the failure to discover the identity of the "Lakeland

friend." Under the plain error standard, and taken in the context of the entire trial,

we cannot say that this statement violated Martinez's substantial rights, nor can it

be said that this comment could not have been remedied by an objection or an

instruction. In fact, the jury was explicitly instructed that it was not to consider, in

any way, the fact that the defendant failed to testify, and was further instructed that

the comments of the attorneys were not evidence and that the jury was to make its

decision based only on the testimony of the witnesses and exhibits admitted in the

record. Accordingly, we conclude that Martinez was not substantially prejudiced

15

by the comment. See Smith, 918 F.2d at 1562 ("[b]ecause statements and arguments of counsel are not evidence, improper statements can be rectified by the district court's instruction to the jury that only the evidence in the case be considered.").

Furthermore, it cannot be said that the jury necessarily would have construed the prosecutor's statement to be a comment on Martinez's failure to testify. Compare Griggs, 735 F.2d at 1324 (holding that the prosecutor's statement, "the defendant has not testified about it," was an improper comment on the defendant's failure to testify); but see United States v. LeQuire, 943 F.2d 1554, 1565-66 (11th Cir. 1991) (discussing Griggs and the failure of Griggs to apply binding Supreme Court precedent requiring the Court to conduct a harmless error analysis). In any event, the context of the comment was in rebuttal of the defense's questioning of the government's failure to obtain certain evidence and, notably, the comment was not so alarming as to draw an objection from defense counsel. See United States v. Dorsey, 819 F.2d 1055, 1061-62 (11th Cir. 1987) ("The defense counsel's failure to object highlights the innocuous nature of the remark."). Thus, under plain error review, we conclude that the prosecutor's comment, though inartful, does not warrant a reversal.

### III. Denigrating Counsel and Cumulative Effect

16

Finally, to the extent that Martinez argues that the prosecutor denigrated defense counsel by discrediting him in front of the jury, we have held that, to "discredit defense counsel in front of the jury is improper, and even subsequent jury instructions aimed at rectifying this error may not ensure that these disparaging remarks have not already deprived the defendant of a fair trial." United States v. De La Vega, 913 F.2d 861, 867 (11th Cir. 1990) citing United States v. McLain, 823 F.2d 1457, 1462 (11th Cir. 1987) overruling on other grounds recognized by United States v. Watson, 866 F.2d 381, 385 n.3 (11th Cir. 1989). In McLain, we further noted that "[r]eversal on the basis of prosecutorial misconduct requires that the misconduct be 'so pronounced and persistent that it permeates the entire atmosphere of the trial.'" McLain, 823 F.2d at 1462. There, we found that the prosecutor's misconduct did not warrant a reversal, but rather the cumulative effect of errors committed by the judge and the prosecutor denied the defendant of his right to a fair trial. Id. (emphasis in original). Here, the prosecutor's comment that the evidence would never be enough for defense counsel, assuming it was improper, was an isolated comment, defense counsel objected to it, and the district court sustained the objection and told the jury to disregard it prior to, as noted above, instructing the jury not to consider as evidence anything said by the attorneys. Thus, the prosecutor's misconduct did not

17

"permeate" the trial and, in any event, was immediately addressed by the district court.

Furthermore, in <u>Hernandez</u>, we found that a prosecutor's comment regarding defense counsel's role as an advocate was probably improper, but found that it did not violate the defendant's substantial rights. The Court stated:

> We note that defense counsel immediately objected to the improper comment and that the trial court sustained the objection. We note that the trial court instructed the jury both before closing arguments and after the closing arguments that the arguments were not evidence and that the jury was to decide Hernandez's guilt based solely on the evidence. Under such circumstances, the statement by the prosecutor is not sufficiently egregious so as to mandate a reversal of Hernandez's conviction.

<u>Hernandez</u>, 145 F.3d at 1439. Like in <u>Hernandez</u>, defense counsel here immediately objected and the district court sustained the objection. The court also instructed the jury to disregard the prosecutor's statement and further instructed the jury that it was not to consider the attorneys' statements as evidence. Accordingly, we conclude that any impropriety by the prosecutor here is not insufficient to mandate reversal.

In sum, we conclude that the prosecutor's statements made in rebuttal to defense counsel's closing argument did not, when taken together, amount to misconduct that "permeated" the entire trial. <u>Compare</u> <u>McLain</u>, 823 F.2d at 1462. Furthermore, taken separately, we cannot say that the district court plainly erred by

18

refusing to <u>sua sponte</u> declare a mistrial on the basis of the prosecutor's comment that only one person knew who the "Lakeland friend" was, and did not err by finding that the prosecutor's comments, rebutting the defense's argument that the government didn't proffer certain evidence, was not an improper attempt to shift the burden of proof to the defendant. For the foregoing reasons, we affirm.

**AFFIRMED.**