**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Charles Allen LeQUIRE, Mike Jenkins, Jerry Allen LeQuire, a/k/a Richard Martin, James Thomas LeQuire, Robert LeQuire, a/k/a Bob Martin, Bonnie Sue Anders, a/k/a Linda Hall, a/k/a Lynn Allen, a/k/a Ann Black, and Harold E. Ward, a/k/a Harold Hall, Defendants–Appellants.**

No. 89–7155.

United States Court of Appeals,
Eleventh Circuit.

Oct. 17, 1991.

F. Lee Bailey, West Palm Beach, Fla., for Jerry Allen LeQuire.

Lee Fugate, Clearwater, Fla. (Court-appointed), for Bonnie Sue Anders.

John W. Hartley, Jr., Montgomery, Ala. (Court-appointed), for Harold E. Ward.

James Eldon Wilson, U.S. Atty., D. Broward Segrest, Asst. U.S. Atty., Montgomery, Ala., for U.S.

Before TJOFLAT, Chief Judge, FAY, Circuit Judge, and HOFFMAN *, Senior District Judge.

HOFFMAN, Senior District Judge:

Appellants Jerry LeQuire, James LeQuire, Charles LeQuire, Robert LeQuire, Bonnie Sue Anders, Harold Ward and Michael Jenkins were convicted in the United States District Court for the Middle District of Alabama on RICO drug conspiracy charges. The convictions are based on a series of incidents involving the importation of large amounts of cocaine from Colombia, South America.

All appellants were found guilty of conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act ("RICO").[1] In addition, Jerry LeQuire was convicted of conducting an enterprise's affairs through a pattern of racketeering activity[2] and engaging in a continuing criminal enterprise.[3]

A multitude of issues are raised on appeal, many of which have been adopted by some or all defendants. After examining each argument, we affirm each appellant's conviction on all counts, with the exception of the judgment concerning the conviction of Bonnie Sue Anders which we reverse and remand for a new trial.

## FACTS

Jerry Allen LeQuire headed an extensive operation importing cocaine from Colombia.

Roianne Houlton Frith, Montgomery, Ala. (Court-appointed), for Charles Allen LeQuire, Mike Jenkins, James Thomas LeQuire, Robert LeQuire.

* Honorable Walter E. Hoffman, Senior U.S. District Judge for the Eastern District of Virginia, sitting by designation.

1. 18 U.S.C. § 1962(d).

2. 18 U.S.C. § 1962(c).

3. 21 U.S.C. § 848.

The drug smuggling began in late 1981 or early 1982 and continued until August of 1983. The evidence at trial revealed an extensive, well-orchestrated conspiracy in which LeQuire arranged for personally owned[4] airplanes to fly from Fort Lauderdale, Florida, into South America for the purpose of transporting large amounts of cocaine back into the United States.

Upon arriving in Colombia, LeQuire's planes were loaded with duffel bags of cocaine and refueled for the return flight. The planes would fly at low altitudes until they reached an airport in Alabama, Tennessee or Georgia.

LeQuire arranged for his ground crews to arrive at the landing sites at approximately the same time as the airplanes. After scouting the area to ensure safety, the ground crew would either arrange for a landing or direct the aircraft to an alternate site.

The planes usually landed after sunset and remained on the ground long enough for the duffel bags to be pushed onto the runway. The entire procedure took only a few minutes. Subsequently, the plane would fly back to the Fort Lauderdale base while the ground crew would drive the cocaine to the base in the trunks of their cars. Vast amounts of cocaine entered the United States in this manner[5] and the enterprise produced extraordinary profits.[6]

On August 3, 1983, a large quantity of cocaine was seized by the federal authorities at Dannelly Field in Montgomery, Alabama. On April 23, 1984, Jerry LeQuire pled guilty to counts of possession of cocaine and importation of cocaine (R. 6–54). LeQuire contends that another condition of the plea was that no further prosecution of any sort would be brought as a result of the August 3, 1983 importation. This contention, however, is not supported by the record.[7]

On July 29, 1988, Jerry LeQuire and the other appellants were named in the indictment underlying this case. The appellants were charged with numerous RICO and Continuing Criminal Enterprise ("CCE") offenses arising out of the drug smuggling enterprise, including the August 3, 1983 incident. In all, 25 persons were named as defendants in the 50–page indictment, containing ten counts. On the motion of some defendants, a severance was granted, following which a superseding indictment was returned in the severed case. This case was tried to a jury with resulting verdicts of guilty, now approved on appeal in *United States v. Gonzalez*, 921 F.2d 1530 (11th Cir.1991). A large number of the original twenty-five defendants were severed, but several were fugitives and other than the appellants, the vast majority of the indicted persons entered pleas of guilty pursuant to plea agreements and testified for the prosecution.

The evidence adduced at trial demonstrated participation in the enterprise on the part of each appellant. Jerry Allen LeQuire was the kingpin in the organization. Charles LeQuire, Jerry's son, was responsible for the management and financial matters of the enterprise. Bonnie Sue Anders, the evidence showed, tapped telephones, transported cocaine and money, and laundered money on behalf of the organization. Thomas LeQuire, Jerry's brother,

4. The airplanes were titled in the names of corporations created by Jerry LeQuire, but the true ownership rested in him. LeQuire himself, after being convicted on a marijuana charge and sentenced in the Key West, Florida federal court, and on bond pending appeal, used the name Richard Martin and avoided serving time on the Key West case until he was arrested in August 1983, for a cocaine smuggling and possession charge in the federal court in Alabama.

5. Karla Espinal, the former wife of Jerry Allen LeQuire, testifying under an agreement with the government, recalled a celebration which took place when the organization became the first group to make 70 successful trips into Colombia without being apprehended by the authorities (R. 14–1339).

6. Testimony reflected that as much as 280 million dollars in cash was stored at Jerry LeQuire's house at one time, much of which remains unaccounted for.

7. Conversely, statements by the U.S. Attorney, and the plea agreement itself, indicate that the acceptance of LeQuire's plea to the two counts constitutes the *entire* agreement between the parties. Additionally, during the Rule 11 hearing on the guilty pleas, the prosecutor stated in open court that there were no other agreements not specifically stated.

was involved in several decisions regarding the enterprise and also transported the cocaine. Robert LeQuire, another of Jerry's brothers, was on several ground crews and also transported large amounts of money and cocaine. Michael Jenkins stole dynamite and delivered money to various individuals in aid of the enterprise. Harold Ward was on the ground crew involving several shipments of cocaine and was linked to discussions regarding the purchase of a plane for future smuggling. The evidence shows that each appellant was involved in the enterprise in various capacities.

A jury found the appellants guilty of a conspiracy to violate RICO. In addition, Jerry LeQuire was convicted of conducting an enterprise's affairs and of engaging in a continuing criminal enterprise. Consequently, Jerry LeQuire was sentenced to a total of sixty years imprisonment and fined $500,000. Charles LeQuire was sentenced to fourteen years and fined $100,000. Bonnie Sue Anders and Michael Jenkins were sentenced to twelve years. James LeQuire, Robert LeQuire and Harold Ward were each sentenced to imprisonment for ten years. Two of the original defendants, Gene LeQuire and Mike LeQuire,[8] were found not guilty, and Jerry Allen LeQuire, on substantive counts, was also found not guilty as to Counts VII, VIII, IX and X.

Because we believe that it is a factor in determining "harmless error" in the case involving Jerry Allen LeQuire, some consideration should be given to Counts VII, VIII and IX pertaining indirectly to the murder of Mildred Ann Cornell on Sunday night, April 22, 1984, in Florida. The evidence discloses that one Terry Cornell had apparently introduced Jerry Allen LeQuire to the Colombians who were providing the cocaine which LeQuire later arranged to be flown to the United States. Subsequently, Terry Cornell, Jr., the son of Mildred Ann Cornell, became active in LeQuire's operations and, along with many others, was interviewed after August 3, 1983, and apparently finally indicated his guilt. The testimo-

ny of Karla Espinal, LeQuire's former wife, gave a vivid description of LeQuire's reaction when he learned that Terry Cornell, Jr., planned to testify for the prosecution and against LeQuire at the trial commencing on April 23, 1984. Initially, according to Espinal, LeQuire wanted to "do away" with Terry Cornell, Jr., but for some reason these plans were changed and LeQuire had his then wife arrange with certain Colombians to kill Cornell's mother, Mildred Ann Cornell. In typical gang warfare, Mrs. Cornell was assassinated in Florida on the night before LeQuire's trial was to begin. LeQuire, of course, was in jail at all times after August 18, 1983. LeQuire presented some evidence at his 1988 trial that an agreement had been reached on April 18, 1984, that LeQuire would plead guilty on the following Monday, and that any motive to silence Terry Cornell, Jr. could not have existed.

Count VII charged Jerry Allen LeQuire, Alvaro Pelaez, James Thomas LeQuire, and Charles Allen LeQuire, with violating 18 U.S.C. § 1512(b)(2)(A), in using physical force against Mildred Ann Cornell with intent to cause and induce Terry Cornell, Jr. and others, to withhold testimony in the Middle District of Alabama official proceeding. Count VIII charges the same defendants with physical force to induce Terry Cornell, Jr. and others to be absent from the official proceeding in the Middle District of Alabama, even though summoned by legal process, in violation of 18 U.S.C. § 1512(b)(2)(D). Count IX charged that these same defendants "and others known and unknown to the Grand Jury" did fire and "cause to be fired" a machine gun into Terry Cornell, Jr.'s apartment in Fort Lauderdale, Florida, causing injury and death to Mildred Ann Cornell, with intent to retaliate against Terry Cornell, Jr. for his attendance at the trial in the Middle District of Alabama, in violation of 18 U.S.C. § 1513(a)(1). Counts VII, VIII and IX were dismissed as to Charles Allen LeQuire and James Thomas LeQuire on mo-

---

**8.** The jury had apparently deadlocked on the guilt or innocence of Mike LeQuire and, without identifying the defendant, sent a note to the Court stating, in effect, that they had agreed except as to Counts I and X as to a defendant. The Government then agreed to dismiss these counts as to that defendant.

tion of the government at the conclusion of all of the evidence in the 1988 trial, thus leaving only Jerry Allen LeQuire as a defendant on trial as to these three counts.

Since Jerry Allen LeQuire was found not guilty as to Counts VII, VIII and IX, it may seem irrelevant to even refer to these counts, but the serious error on the part of the prosecutor in his closing argument to the jury in referring to LeQuire's failure to take the witness stand or otherwise mention the Colombians makes it of importance in determining whether this was "harmless error" as applied to the facts of this case.

## DISCUSSION

### I. DOUBLE JEOPARDY

On appeal, Jerry LeQuire first argues that the district court erred, as a matter of law, in rejecting his claim that prosecution is barred by the Double Jeopardy Clause. LeQuire contends that his initial plea agreement, reached in 1984, barred later RICO and CCE prosecution. Essentially, he claims that the two prosecutions turn on similar facts and are thus barred by double jeopardy.

■ This contention misunderstands the nature and purpose of RICO. The legislative history of RICO demonstrates that Congress did not intend predicate offenses to be lesser included offenses in the RICO provisions. *United States v. Hawkins*, 658 F.2d 279 (5th Cir.1981); *United States v. Boldin*, 772 F.2d 719, 729 (11th Cir.1985), *cert. denied*, 475 U.S. 1048, 106 S.Ct. 1269, 89 L.Ed.2d 577 (1986). Instead, the two

offenses "are intended to deter two different kinds of activity: racketeering on the one hand and narcotics violations on the other." *Boldin*, 772 F.2d at 729, *quoting United States v. Thomas*, 757 F.2d 1359 (2d Cir.1985), *cert. denied*, 475 U.S. 1098, 106 S.Ct. 1498, 89 L.Ed.2d 899 (1986).

■ Further, in his brief Jerry LeQuire recognizes the applicability of *Garrett v. United States*, 471 U.S. 773, 105 S.Ct. 2407, 85 L.Ed.2d 764 (1985), in complex RICO cases (Brief of Appellant Jerry LeQuire at 28). In *Garrett*, the Supreme Court held that successive prosecutions for a CCE and the offense of importation of narcotics, charged as a predicate offense under the CCE charge, did not violate double jeopardy principles. LeQuire's acknowledgement of the *Garrett* case in this context lessens our need to examine the impact of the Supreme Court's recent decision in *Grady v. Corbin*, 495 U.S. 508, 110 S.Ct. 2084, 2090, 109 L.Ed.2d 548 (1990) (superseded by statute as stated in *Purcell v. United States*, 594 A.2d 527 (D.C.App.1991)).[9] We note, however, that the rationale of *Garrett* is more appropriate than *Grady* in RICO situations, which can run over an extended period of time and involve a large number of individuals. *Grady*, on the other hand, is more applicable in single offense situations, such as drunk driving. In view of the complex aspects of proof required in a RICO prosecution, such as the requirement of both an enterprise and a pattern of activity, we conclude that racketeering constitutes an offense different than and separate from an offense involving narcotics charges.[10]

---

9. In *Grady*, the defendant was at fault in a car accident in which the driver of another vehicle was fatally injured. After a guilty plea of driving while intoxicated and failing to keep to the right of the median had been entered, the prosecutor attempted to bring charges of manslaughter and assault arising out of the same accident. The defendant objected on double jeopardy grounds.

In addressing this argument, the Court held that:

[T]he Double Jeopardy Clause bars a subsequent prosecution if, to establish an essential element of an offense charged in that prosecution, the government will prove conduct that constitutes an offense for which the defendant has already been prosecuted.

*Grady*, 110 S.Ct. at 2087.

10. Two post-*Grady* cases from the Third Circuit, *United States v. Esposito*, 912 F.2d 60 (3d Cir. 1990), *reh'g denied*, *United States v. Esposito*, 1990 WL 106249, 1990 U.S.App. LEXIS 23, 197 (3d Cir.1990), *and cert. dismissed*, *Esposito v. United States*, — U.S. —, 111 S.Ct. 806, 112 L.Ed.2d 1032 (1991), and *United States v. Pungitore*, 910 F.2d 1084 (3d Cir.1990), reach similar conclusions in applying *Grady* to RICO offenses. However, on October 24, 1990, the Second Circuit decided *United States v. Calderone*, 917 F.2d 717 (2d Cir.1990), which tends to express contrary views. See our discussion of this issue in *United States v. Gonzalez*, 921 F.2d 1530 (11th Cir.1991), incorporated herein by reference.

As a further double jeopardy contention, Jerry LeQuire argues that he was subjected to multiple prosecutions because of the government's failure to exercise due diligence. Specifically, LeQuire alleges that the government had sufficient evidence to prosecute for RICO and CCE violations in 1984, but failed to do so until five days before the fifth anniversary of the Montgomery importation.[11] This contention, however, is not supported by the facts or law in this case.

■ Initially, it must be noted that any pre-indictment delay should be analyzed under the Fifth Amendment's due process clause. *United States v. MacDonald*, 456 U.S. 1, 102 S.Ct. 1497, 71 L.Ed.2d 696 (1982). Binding precedent in this Court dictates that to show a due process violation, a defendant must satisfy a two-prong test. First, the defendant must show that the delay caused actual prejudice to his defense; and second, the defendant must prove that the delay was a product of deliberate design by the government to gain a tactical advantage. *See, e.g., Stoner v. Graddick*, 751 F.2d 1535, 1542 (11th Cir. 1985); *United States v. Warren*, 772 F.2d 827, 836 (11th Cir.1985), *cert. denied*, 475 U.S. 1022, 106 S.Ct. 1214, 89 L.Ed.2d 326 (1986); *United States v. Jorge–Salon*, 734 F.2d 789, 791–92 (11th Cir.), *cert. denied*, 469 U.S. 869, 105 S.Ct. 215, 83 L.Ed.2d 145 (1984).

■ The appellants have not shown substantial prejudice or intentional delay for tactical advantage in this case. A stringent standard is employed when examining the issue of prejudice. *Stoner*, 751 F.2d at 1544 (citing *Tiemens v. United States*, 724 F.2d 928, 929 (11th Cir.), *cert. denied*, 469 U.S. 837, 105 S.Ct. 134, 83 L.Ed.2d 74 (1984)). "The prejudice shown must be such as to impair the fairness of the trial." *United States v. Solomon*, 686 F.2d 863, 872 (11th Cir.1982).

In examining LeQuire's claim and the record itself, we can find no substantial prejudice caused by this delay. There is no mention of deaths of key witnesses, de-

struction of documents or evidence, or any other event which would impair the fairness of the trial. Instead, LeQuire claims that specifics surrounding his 1984 plea agreement can no longer be remembered by his counsel, thus denying him the opportunity to exploit this at trial (Brief of Appellant at 29). An examination of the 1984 agreement and a transcript of the Rule 11 proceedings, however, reveals that the plea itself constitutes the entire agreement between the two parties; thus, this argument is without merit. The prejudice alleged by LeQuire simply does not measure up to the stringent standard employed in these cases. Accordingly, we affirm the district court's denial of relief on this ground.

Additionally, we hold that LeQuire has not met his burden of proving intentional delay for tactical advantage. LeQuire made no showing that the prosecution delayed to gain a tactical advantage. The prosecution, on the other hand, alleges that it had insufficient evidence and witnesses to prove a RICO charge or a Continuing Criminal Enterprise in 1984. Further, Karla Espinal, the key witness for the prosecution, did not begin cooperating with the government until September of 1987. These factors demonstrate a need on the part of the prosecution to further investigate the drug smuggling operation.

■ Prosecutors are under no duty to file charges before they feel they can meet their burden of proof. *United States v. Reme*, 738 F.2d 1156, 1163 (11th Cir.1984), *cert. denied*, 471 U.S. 1104, 105 S.Ct. 2334, 85 L.Ed.2d 850 (1985). Moreover, "even where the defendant has been prejudiced by pre-accusation delay, if it is investigative delay the defendant has not been deprived of due process." *Id.*

LeQuire has not met his burden here. Since controlling precedent in this court places the burden on the defendant to prove an intent to delay to gain tactical advantage, we must affirm denial of relief on this ground.

---

**11.** The Montgomery, Alabama, drug shipment of August 3, 1983, was seized by the federal authorities. Although this was the last importa-

tion with which the LeQuire enterprise was allegedly connected, the indictment in this case was returned on July 29, 1988.

## II. VARIANCE BETWEEN INDICTMENT AND PROOF

Bonnie Sue Anders, James LeQuire, Charles LeQuire, Robert LeQuire and Michael Jenkins allege that there was a variance between the indictment and the proof on the conspiracy charge. Essentially, they contend that the conspiracy to smuggle cocaine and marijuana into the United States ended on August 3, 1983.[12] Based on this contention, the appellants argue that any evidence of activities after this date establishes separate and distinct conspiracies constituting a variance between the indictment and the proof at trial.

■ No material variance will exist if a reasonable trier of fact could have found beyond a reasonable doubt the existence of the single conspiracy charged in the indictment. *United States v. Cole*, 755 F.2d 748, 764 (11th Cir.1985). Furthermore, in *United States v. Watchmaker*, 761 F.2d 1459, 1477 (11th Cir.1985), *cert. denied*, 474 U.S. 1100, 106 S.Ct. 879, 88 L.Ed.2d 917 (1986), the court stated:

> Finally, appellants argue that their convictions should be reversed because the evidence proved multiple conspiracies rather than the single conspiracy required by RICO. Because of the variety of activities which may be undertaken by a criminal enterprise, there are few RICO trials in which such a claim could not be made, and it has been soundly rejected by the courts of this Circuit.

The reasoning applied in *Watchmaker* is relevant to the instant case as well. We conclude, therefore, that there was no material variance in this case. A reasonable jury could have found that the evidence presented at trial established that the appellants conspired to engage in one common enterprise even after the August 3, 1983 seizure of cocaine in Alabama.

■ Even if the evidence did not support the finding of a single conspiracy, such is not fatal to the convictions unless it prejudices substantial rights of the appellants. Prejudice to substantial rights can exist in one of two circumstances: (1) where proof at trial is so different from the indictment that a defendant was unfairly surprised and could not prepare a defense and (2) where so many defendants exist that a jury is likely to confuse evidence among the defendants. *United States v. Caporale*, 806 F.2d 1487, 1500 (11th Cir.1986), *cert. denied*, 483 U.S. 1021, 107 S.Ct. 3265, 97 L.Ed.2d 763 (1987).[13]

After examining the record, we can find no prejudice in this case. A reasonable jury could have found, based on the evidence presented at trial, a single conspiracy in which the appellants were active participants. More importantly, the fact that Jerry LeQuire was acquitted on certain charges and two other defendants were acquitted outright demonstrates that the jury was able to sift the evidence as to each defendant individually. *See, e.g., United States v. Rodriguez*, 765 F.2d 1546, 1553 (11th Cir.1985). Thus, the appellants were fairly notified of any charges against them and the indictment was not so confusing that the jury could not determine guilt.

## III. SUFFICIENCY OF THE EVIDENCE

Appellants Ward, Jenkins, James LeQuire, Charles LeQuire and Robert Le-

---

**12.** Several attempts to break Jerry LeQuire out of jail are indicative of the fact that the enterprise did not shut down on August 3, 1983, but instead continued to operate with the hope of further importation of cocaine for profit. The attempts to break out of jail were testified to by Karla Espinal, the former wife of Jerry LeQuire, and allegedly were to take place in Miami, Key West and Montgomery, Alabama. The latter attempt was fully supported by a note written by Jerry LeQuire to his then wife, Karla, which was in evidence and which also refers to a plan better than taking over two U.S. Marshals. Even as late as April 1985, Jerry LeQuire and some of his associates had vague plans to be released from the federal penal system by committing acts of terrorism—dynamite bombings to be specific.

**13.** Appellant Bonnie Sue Anders claims that since evidence showed her involvement in only the alleged second conspiracy, this constitutes a misjoinder under Rule 8(b) of the Federal Rules of Criminal Procedure. In addition, Anders claims that such a misjoinder is inherently prejudicial. The Supreme Court, however, has held that misjoinder under Rule 8 is subject to a harmless error test, thus implying that one claiming misjoinder must prove prejudice as well. *United States v. Lane*, 474 U.S. 438, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986). Anders has not satisfied this test.

Quire argue that the evidence is insufficient to prove their connection with the enterprise or the requisite number of predicate acts. In addressing this contention, we review the evidence in the light most favorable to the government and may reverse only if no reasonable jury could have found the appellants guilty beyond a reasonable doubt. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Watson,* 866 F.2d 381, 386 (11th Cir.1989).

■ Guilt under the conspiracy provision of RICO, 18 U.S.C. § 1962(d), requires a showing of a defendant's participation, either directly or indirectly, in a scheme to violate one of the listed "prohibited activities". *United States v. Kopituk,* 690 F.2d 1289, 1323 (11th Cir.1982), *cert. denied,* 463 U.S. 1209, 103 S.Ct. 3542, 77 L.Ed.2d 1391 (1983) (citing *United States v. Elliott,* 571 F.2d 880, 903 (5th Cir.), *cert. denied,* 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978)). The participation in the prohibited activity, however, must be in the form of the commission of two or more predicate acts. *Id.* The existence of the conspiracy agreement does not have to be proven by direct evidence. Instead, it can be inferred from "the conduct of the alleged participants or from circumstantial evidence of the scheme." *United States v. Ard,* 731 F.2d 718, 724 (11th Cir.1984) (quoting *United States v. Ayala,* 643 F.2d 244, 248 (5th Cir. Unit A 1981)).

After a careful review of the record in the light most favorable to the government, we conclude that the evidence was sufficient to allow a reasonable trier of fact to find guilt beyond a reasonable doubt. In contending that the evidence is insufficient to support prosecution, the appellants argue that any evidence of their participation in the drug smuggling operation has been refuted by their testimony or by testimony of other witnesses. Further-

more, the appellants argue that the one witness who testified as to activities involving each of them in the enterprise, Karla Espinal, is biased due to her hatred of the LeQuire family.

The appellants obviously are "unfamiliar with the line of cases in this Circuit holding that uncorroborated testimony of an accomplice is sufficient to support a conviction in the Federal Courts if it is not on its face incredible or otherwise insubstantial." *United States v. Iacovetti,* 466 F.2d 1147, 1153 (5th Cir.1972), *cert. denied,* 410 U.S. 908, 93 S.Ct. 963, 35 L.Ed.2d 270 (1973), *cited in United States v. Elliott,* 571 F.2d 880, 895 fn. 13 (5th Cir.1978). For a witness's testimony to be incredible or insubstantial on its face, it must be "testimony as to facts that [the witness] physically could not have possibly observed or events that could not have occurred under the laws of nature." *United States v. Garner,* 581 F.2d 481, 485 (5th Cir.1978) (quoting *United States v. Cravero,* 530 F.2d 666, 670 (5th Cir.1976)). Applying this standard, we find that the testimony in this case is not incredible and sufficient evidence exists in the record to support the convictions.[14]

## IV. SEVERANCE

Following the return of the indictment on July 29, 1988, motions for severance were filed by numerous defendants. By order entered on November 7, 1988, the trial court granted severance as to certain persons not then served with the indictment, i.e., Arrango, Gonzalez, Herrera, Palaez and Wilson. Severance was also granted pursuant to motions for severance or for reasons noted by the court as to Abner, William Benton Ziegler, Harry Dale Ziegler, Allen Camplin, Mahdi, Menendez, Maierhoffer, Preswood, Roundy, Sweeton and Wilson. This left the following defendants for trial on November 29, 1988 in this case: Jerry Allen LeQuire, James Thomas

---

**14.** Appellant Ward also alleges that the indictment itself was insufficient in that the government failed to establish the required predicates before the grand jury. The decision of the Supreme Court in *Costello v. United States,* 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956), however is dispositive of this argument. In

*Costello,* the Court held that inadequate evidence before a grand jury could not be the basis for challenging an indictment. *Id.; see also United States v. Norton,* 867 F.2d 1354, 1358 (11th Cir.), *cert. denied,* 491 U.S. 907, 109 S.Ct. 3192, 105 L.Ed.2d 701 (1989). Thus, Ward's claim must fail.

LeQuire, Charles Allen LeQuire, Robert Le-Quire, Michael LeQuire, Gene LeQuire, Mike Jenkins, Bonnie Sue Anders and Harold E. Ward.

Harold Ward and James LeQuire argue that the court erred in denying their motions for severance. The major argument of appellant Ward involves the alleged spillover effect from his joinder with the other defendants, who allegedly had much greater involvement in the enterprise. Appellant James LeQuire, on the other hand, states that the district court erred in denying his motion for severance made after the court decided that a vault found in his back yard could not be used as evidence against him, but could be introduced against his codefendants.[15] After reviewing both claims, we find that appellants have not shown compelling prejudice as a result of the joint trial and we affirm the district court's denial of the motion to sever.

Initially, we note that the denial of a motion for severance is reversible only for an abuse of discretion, and compelling prejudice must be proved before an abuse of discretion will exist. *United States v. Watchmaker*, 761 F.2d 1459, 1476 (11th Cir.1985), *cert. denied*, 474 U.S. 1100, 106 S.Ct. 879, 88 L.Ed.2d 917 (1986) (citing *United States v. Phillips*, 664 F.2d 971, 1016 (5th Cir.1981), *cert. denied*, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982)). Compelling prejudice cannot be solely proved by the quantity of evidence presented against codefendants. *See United States v. Casamayor*, 837 F.2d 1509, 1511 (11th Cir.1988), *cert. denied*, 488 U.S. 1017, 109 S.Ct. 813, 102 L.Ed.2d 803 (1989). Instead, we must determine whether the jury could sift through all of the evidence

and render an impartial verdict as to each defendant. *Watchmaker*, 761 F.2d at 1476. If so, the motion for severance should be denied. *United States v. Zielie*, 734 F.2d 1447, 1464 (11th Cir.1984), *cert. denied*, 469 U.S. 1189, 105 S.Ct. 957, 83 L.Ed.2d 964 (1985).

In this case, the district court clearly instructed the jury at the beginning of the trial that each defendant and each offense was to be considered separately. This instruction was repeated at the end of the trial when the judge gave final instructions prior to deliberation. More importantly, the jury's acquittal of two defendants[16] demonstrates that the jury was able to sort through all of the evidence in this complex case. The appellants, therefore, were not prejudiced by the joint trial.

## V. STATUTE OF LIMITATIONS

Appellant Ward argues that the trial court erred in not dismissing the charge against him on the ground that the five-year statute of limitations period had expired. Essentially, Ward contends that his activities ceased on May 23, 1983, when he was shot in the back during a robbery of a shipment of cocaine in Sylvania, Georgia. Since the indictment in this case was issued on July 29, 1988, Ward posits, his five-year limitations period had expired and his conviction is due to be reversed. This contention fails, however, because the *indictment* alleged, and the evidence showed, that the underlying conspiracy of which Ward was convicted continued until at least August 3, 1983.[17]

Law in this Circuit recognizes that a conspirator's participation in a conspiracy is presumed to continue until all activity

---

**15.** The trial judge decided that the vault, allegedly used to store money for the enterprise, should be suppressed as evidence against James LeQuire due to the illegal search in which it was found. The other appellants did not have standing to object to the search and thus, the vault could be introduced against them. (R. 3–547). The introduction of this evidence against the other defendants, James LeQuire argues, allowed this information to spill over into his trial.

**16.** In addition to acquitting Michael and Gene LeQuire of all charges, the jury also acquitted

Jerry LeQuire of the counts charged in the indictment relating to the murder of Mildred Ann Cornell on April 23, 1984.

**17.** This is the last known date on which the organization transported cocaine into the United States from Colombia. The arrest of Jerry LeQuire on August 18, 1983 foiled the enterprise, although the government contends that attempted escapes from prison demonstrate an ongoing enterprise through at least April of 1984.

relating to the conspiracy is ceased. *See United States v. Finestone*, 816 F.2d 583, 589 (11th Cir.), *cert. denied*, 484 U.S. 948, 108 S.Ct. 338, 98 L.Ed.2d 365 (1987). Accordingly, Ward is presumed to be a participant for the duration of the conspiracy unless he can overcome the presumption by proving his withdrawal.

■ A two-prong test exists to establish a withdrawal from a conspiracy: 1) first, the defendant must prove that he has taken affirmative steps to defeat the objectives of the conspiracy and 2) he must show either that he made a reasonable effort to communicate these acts to his co-conspirators or disclosed the scheme to law enforcement authorities. *Id., citing United States v. United States Gypsum Co.*, 438 U.S. 422, 464–65, 98 S.Ct. 2864, 2887, 57 L.Ed.2d 854 (1978). Ward cannot succeed on either prong of this test. A careful review of the record does not disclose any affirmative act to disavow his part in this conspiracy. Even if we assume that he did disavow his activities, he did not communicate this disavowal to anyone. Conversely, Ward continued to cover up for the enterprise even after his involvement in the smuggling operation itself had allegedly ceased.[18] Thus, we must affirm the district court's decision that the case against Ward was not barred by the statute of limitations.

## VI. EX POST FACTO LAWS

Appellant Ward also argues that his conviction is void as violative of the constitutional prohibition of ex post facto laws. Art. I, § 9, cl. 3. Specifically, he contends that because 18 U.S.C. §§ 1961 and 1962 did not exist at the time of his arrest in May of 1983, he cannot later be convicted under the same statute. We do not agree.

■ The RICO statute was enacted into law in 1970. Moreover, sections 1961 and 1962 did in fact exist in 1983. Ward claims that a 1986 amendment to section 1961 violated his rights under the ex post facto clause, but fails to point out exactly which new clause violated his rights. Section 1961 was amended to include sections 1512 and 1513 thereunder, dealing with the ob-

struction of justice, in the list of predicate acts under RICO. This modification, however, did not affect the rights of Ward, who had been involved in numerous enterprise activities prior to his shooting in 1983.

■ Furthermore, this claim was never presented to the trial court and may not be raised for the first time on appeal. Failing to assert a defense at trial waives any future use of such defense. *United States v. Bascaro*, 742 F.2d 1335, 1365 (11th Cir. 1984), *cert. denied*, 472 U.S. 1017, 105 S.Ct. 3476, 87 L.Ed.2d 613 (1985); *see also United States v. Wilson*, 894 F.2d 1245, 1253 (11th Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 3284, 111 L.Ed.2d 792 (1990).

## VII. PROSECUTORIAL MISCONDUCT

Virtually all appellants ask us to reverse their convictions because of alleged improper comments made in the course of trial and during closing argument. These comments, they argue, prejudiced the jury and therefore denied them their right to a fair trial. As numerous comments are complained of, we shall address the contentions *in seriatim*.

### A. *Jerry Allen LeQuire*

During his closing argument, the prosecutor made the following remark to the jury:

> Well, ladies and gentlemen, we have piled on more evidence in this case than just about those incidents, we have proven literally 70 to a hundred an[d] eight loads came in at the direction of Jerry Allen LeQuire, assisted by the people who sit with him, and others who are charged in this indictment.
>
> One thing Jerry Allen LeQuire does not have going for him, *he doesn't have the guts to tell it about the Colombians and get on that stand—*

(R. 19–2372) (emphasis added). Counsel for Jerry LeQuire, later joined by counsel for the other non-testifying defendants, demanded a mistrial, claiming that this was an impermissible reference upon the defendants' failure to testify. The government replied that the statement was not inten-

---

**18.** In the hospital after his shooting, Ward was questioned by the authorities concerning the robbery. His fictitious responses have since been refuted by the evidence.

tional, but instead was made in response to defense counsel's earlier argument that the government's case was made up of "liars on parade".

The district court denied the motion for mistrial, finding that although the remark was improper, it constituted harmless error in the context in which it was made. Because of the seriousness of the prosecutor's needless comment, we must carefully examine the remark's impact on the fairness of LeQuire's trial.

It is a basic constitutional precept that reversible error will exist in a criminal case if the prosecution comments on the fact that the defendant does not testify. *Griffin v. California,* 380 U.S. 609, 612, 85 S.Ct. 1229, 1232, 14 L.Ed.2d 106, 108 (1965). A prosecutor's comment on the failure of the accused to testify may not, however, always mandate reversal. *Chapman v. California,* 386 U.S. 18, 22, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967); *Marsden v. Moore,* 847 F.2d 1536, 1548 (11th Cir.), *cert. denied,* 488 U.S. 983, 109 S.Ct. 534, 102 L.Ed.2d 566 (1988).

In determining if a prosecutorial remark impairs the integrity of the defendant's right not to testify the test is whether the defense can show that the remark was intended to comment on the defendant's silence *or* was of such character that a jury would naturally and necessarily construe it as a comment on the defendant's silence. *United States v. Stuart–Caballero,* 686 F.2d 890, 892 (11th Cir.1982), *cert. denied,* 459 U.S. 1209, 103 S.Ct. 1202, 75 L.Ed.2d 444 (1983). *See also United States v. Carrodeguas,* 747 F.2d 1390, 1395 (11th Cir.1984), *cert. denied,* 474 U.S. 816, 106 S.Ct. 60, 88 L.Ed.2d 49 (1985) ("test ... is whether or not the statement was manifestly intended or of such character that a jury would naturally and necessarily take it to be a comment on the failure of the accused to testify"). Moreover, the remark must be examined in the context in which it is made. *Rogers v. McMullen,* 673 F.2d 1185 (11th Cir.1982), *cert. denied,* 459 U.S. 1110, 103 S.Ct. 740, 74 L.Ed.2d 961 (1983).

Applying this test to the remark complained of in the instant case leads us to conclude that it was probably not manifestly intended. No manifest intent exists where another, equally plausible explanation for the remark is present. *Carrodeguas,* 747 F.2d at 1395. In this case, the prosecutor contends that he did not manifestly intend to comment on Jerry LeQuire's failure to testify. Instead, he argues that his remark was intended only to rebut the accusation of the defense that the government's witnesses were liars. In response to an attack on the government and the conduct of its case, a prosecutor may present what even amounts to a bolstering argument if it is specifically done in rebuttal to assertions made by defense counsel in order to remove any stigma cast upon the government or its witnesses. *United States v. Dorr,* 636 F.2d 117, 120 (5th Cir. Unit A 1981).

After a thorough examination of the circumstances surrounding the prosecutor's remark, we find his "invited argument" explanation for the remark to be at least as plausible as any argument that he manifestly intended to comment on Jerry LeQuire's failure to take the stand. Accordingly, we conclude, as did the trial judge, that the prosecutor had no manifest intent to comment on Jerry LeQuire's failure to testify.

The second part of the test, however, is more problematic. The prosecutor's remark that Jerry LeQuire "doesn't have the guts to tell about the Colombians and get on that stand" could not have been interpreted by the jury as anything but a comment on Jerry LeQuire's silence.[19] The argument must now focus on whether the prosecutor's direct comment mandates reversal.

Jerry LeQuire contends that *United States v. Griggs,* 735 F.2d 1318 (11th Cir. 1984), mandates reversal. In *Griggs,* the prosecutor made the following fatal error by saying:

There is absolutely no evidence, there is no testimony, not a single person has

---

**19.** It is also important to note that the prosecutor made a gesture towards the witness stand while making the remark. This is further proof that the jury understood the comment to be an assertion that the defendant had failed to testify.

said Mr. Griggs was afraid of an unjustified conviction. Mr. Thomas [Griggs' attorney] has just asked you to assume that, even though the defendant has not testified about it and no one has testified about it.

*Griggs,* 735 F.2d at 1320.

The court held that the defendant in *Griggs* was entitled to a new trial for the improper remark of the prosecutor; the *Griggs* opinion, however, makes no reference to the "harmless error" doctrine, as stated in *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), holding that before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt.

Nor did *Griggs* consider *United States v. Hasting,* 461 U.S. 499, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983), decided about thirteen months prior to *Griggs. Hasting* referred to a prosecutor's statement in failing to rebut the prosecution's case. On the government's appeal following the action of the Seventh Circuit in setting aside a jury verdict of guilty, the Supreme Court expressed the view that the Seventh Circuit was exercising its supervisory powers to discipline the prosecutor, and that the harmless-error rule of *Chapman* cannot be voided by an assertion of supervisory power over a prosecutor. In positing the issue it was said (p. 510, 103 S.Ct. p. 1981):

> The question a reviewing court must ask is this: absent the prosecutor's allusion to the failure of the defendant to proffer evidence to rebut the testimony of the victims, is it clear beyond a reasonable doubt that the jury would have returned a verdict of guilty?

Because the evidence demonstrated a compelling case of guilt, the Supreme Court reversed the Court of Appeals in ordering a new trial based on the prosecutor's argument.

As we were concerned that *Griggs* failed to mention *Chapman, Hasting,* and the harmless-error rule, we have examined the briefs filed in *Griggs.*[20] As anticipated the prosecution's argument on harmless-error is confined to one paragraph, ten lines in length. The force of the prosecution's argument was directed to other aspects of the case. Understandably, the defendant did not mention the harmless-error doctrine; but did discuss *United States v. Hasting,* 660 F.2d 301 (7th Cir.1980), which was later reversed by the Supreme Court. The prosecution, after the opinion had been filed in *Griggs,* then petitioned for rehearing concentrating essentially all of its argument on the harmless-error rule, but the petition for rehearing was denied. The timing of the briefs with no emphasis on harmless-error may well have contributed to the *per curiam* opinion in *Griggs.* In light of the failure of the court in *Griggs* to consider this relevant and binding Supreme Court precedent, we decline to follow *Griggs* to the extent that it does not consider the harmless error rule. Accordingly, we now examine the application of the harmless error rule in the present case. *Accord Marsden v. Moore,* 847 F.2d 1536, 1548 (11th Cir.1988).

The government contends, in essence, that the overwhelming evidence against Jerry LeQuire, combined with the curative instruction[21] given by the judge renders this improper comment harmless.

In declaring a constitutional error to be harmless, however, this court

---

**20.** The briefs filed in *Griggs,* with the exception of the petition for rehearing, all predated the Supreme Court opinion in *Hasting.*

**21.** Immediately after the improper comment was made, the district court judge gave the following curative charge to the jury:

> At the time we recessed, Mr. Segrest had made a comment about Mr. LeQuire not having said something about the Colombians from the witness stand. He indicates that he was talking about—would have gone on to say that he didn't make any statements about the Colombians or has not cooperated in other respects. I charge you as strongly as I can charge you about anything in this case, that a person has an absolute right not to testify. And no adverse inference can properly be drawn if someone elects not to testify, and it would be improper and it is improper for the Government Attorney to suggest anything concerning the failure of any witness to take the witness stand.

(R. 19–2375–76). The use of the word "witness" in the last sentence was later corrected by the court by telling the jury that the word "defendant" was intended.

must be able to declare a belief that it was harmless *beyond a reasonable doubt. Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Given the inflammatory nature of the prosecutor's comment and his gesture made towards the witness stand, we would not conclude beyond a reasonable doubt that this was harmless error *but for* the fact that the jury returned not guilty verdicts in Jerry LeQuire's favor on issues pertaining directly to the Colombians (i.e., Counts VII, VIII, IX and X).

In addition, where Counts I, II, and III are concerned, trial counsel for Jerry Le-Quire stipulated and conceded his client's guilt in flying marijuana into Marathon, Florida, on December 5, 1981; in also flying a load of marijuana into Madisonville, Tennessee, and in finally causing the transportation of a load of cocaine into Montgomery, Alabama. The overwhelming evidence of guilt on the RICO and CCE charges, as to Jerry LeQuire, and the curative instruction do negate the fact that an improper seed was planted in the minds of the jurors, thus possibly influencing their verdict. We, therefore, affirm Jerry Le-Quire's conviction on these counts.

### B. *Charles LeQuire, Robert LeQuire, Michael Jenkins and Harold Ward*

Appellants Charles LeQuire, Robert Le-Quire, Michael Jenkins and Harold Ward, all of whom did not testify at trial, allege that the spillover affect from the improper comment concerning Jerry LeQuire's failure to testify entitles them to a new trial as well. We disagree.

In analyzing these contentions, we recognize that both direct and indirect comments on a defendant's failure to testify can invalidate a conviction. *United States v. Bright*, 630 F.2d 804, 825 (5th Cir.1980). The test we must apply is unchanged by the fact that a direct statement does not exist as to any defendant except Jerry Le-Quire. The appellants still must prove that it was the prosecutor's manifest intention to remark on their silence or that the jury

necessarily understood the comment to be a statement on their silence. *United States v. Stuart–Caballero*, 686 F.2d 890, 892 (11th Cir.1982), *cert. denied*, 459 U.S. 1209, 103 S.Ct. 1202, 75 L.Ed.2d 444 (1983); *United States v. Rosenthal*, 793 F.2d 1214, 1243 (11th Cir.1986), *cert. denied*, 480 U.S. 919, 107 S.Ct. 1377, 94 L.Ed.2d 692 (1987). Moreover, the comments must be examined in the context in which they are made. *Rogers v. McMullen*, 673 F.2d 1185 (11th Cir.1982), *cert. denied*, 459 U.S. 1110, 103 S.Ct. 740, 74 L.Ed.2d 961 (1983).

Here, the statement which the appellants claim denied them a fair trial was: "[o]ne thing *Jerry Allen LeQuire* does not have going for him, he doesn't have the guts to tell it about the Colombians and get on that stand" (R. 19–2372). This comment was made regarding Jerry LeQuire's failure to testify, not the appellants. Accordingly, we hold that the prosecutor did not possess the requisite manifest intent as to the non-testifying defendants.

Next, we must examine whether the jury naturally and necessarily would take the comment to be a statement on the appellants' failure to testify. The question is not whether the "jury possibly or even probably would view the challenged remark in this manner but whether the jury *necessarily* would have done so". *United States v. Griggs*, 735 F.2d 1318, 1324 (11th Cir.1984) (quoting *Williams v. Wainwright*, 673 F.2d 1182, 1185 (11th Cir.1982) (emphasis in original)).

In the instant case no direct mention was made of the non-testifying defendants' failure to testify. Instead, the remark was made concerning a co-defendant's silence and the jury could easily have taken it to be just that, a remark on Jerry Lequire's silence. In light of this finding, we cannot say that the jury necessarily would have taken the challenged remark to be a comment on the appellants' failure to testify.

### C. *Bonnie Sue Anders*

This defendant, Anders, was charged in three of the ten counts contained in the indictment.[22] The only point of any signifi-

---

**22.** Count One (I) was a RICO conspiracy count against all defendants to conduct the affairs of

an enterprise through the commission of acts in a pattern of racketeering activity, alleging viola-

cance again involves the prosecutorial tactics in attempting to show the prior indictments and convictions of Bonnie Sue Anders in the instant case in which she elected not to testify and her character had not become an issue by any evidence offered by her. Fed.R.Evid. 404(a)(1).

The five (5) incidents involved each arose during the presentation of the government's case-in-chief. The first incident occurred on December 5, 1988, after the case had been proceeding for approximately one week. The witness was Brenda Champlin (testimony commenced at R. 13–1057), who was named as a defendant in the 1988 indictment (erroneously named Camplin) along with many others, and who negotiated a plea agreement requiring her to testify. Champlin had accompanied Anders to Fort Lauderdale from Kentucky on several occasions immediately following the Sylvania, Georgia, robbery on May 23, 1983. It is obvious that Anders and Champlin became good friends and that Anders' past history was well known to Champlin. At a point where the prosecutor was attempting to show the part played by Anders in the preparation of a partially fictitious video tape made in 1988 for purported use by the defendants in the 1988 trial, the prosecutor asked Champlin (R. 13–1095–96):

Q. Okay. What was occurring that would require you—had you been indicted at that time?

A. No.

Q. Okay. What was occurring or what were you told was occurring that might put you in a position to have to testify in court?

A. Someone else had been indicted.

Q. Who?

A. Bonnie Anders.

Q. But in a different case up in Kentucky, right?

A. Yes.

tion of 18 U.S.C. § 1962(c). This included a conspiracy to smuggle cocaine and marijuana into the United States from South America. Count Two (II) charged a RICO violation in conducting the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1961(1). Count Five (V) charged Anders with engaging in a continuing criminal enterprise (CCE). The trial court granted An-

### (MOTION FOR MISTRIAL)

At this point Brenda Champlin was temporarily excused (R. 13–1101) to return the following morning after the partially fictitious tape had been seen and heard by defense counsel. Layton Champlin, the son of Brenda Champlin, then testified. Although Layton was not indicted, his name was included in his mother's plea agreement. Layton testified for the balance of the day and was carried over until the next morning.

After the jury had been excused for the day, the motion for mistrial was argued. The court volunteered to give a curative instruction and criticized the prosecution for not anticipating Brenda Champlin's response. Prosecutor Segrest suggested that the answer of the witness only reflected that Anders was indicted in Kentucky but the nature of the alleged crime was not mentioned (R. 13–1144). Such an argument by the prosecutor is aside from the point that an indictment for any charge may well be perceived as reflecting on a trait of character; such character evidence is clearly prohibited by Federal Rules of Evidence 404(a).

Incident No. 2 occurred while Layton Champlin was testifying during the same afternoon session (R. 13–1134). Another prosecutor was questioning the witness:

Q. Okay. Let's talk about that tape. When did you make this tape?

A. That was after Bonnie was indicted in Kentucky.

Q. And what year was that?

A. That was—this is—this year.

Q. 1988?

A. Yes, ma'am.

### (MOTION FOR MISTRIAL)

It is difficult to conclude that the direct question by the prosecutor commanded the

ders' motion to dismiss Count Two for failure on the part of the prosecution to allege two or more predicate acts or crimes. Count Five was later terminated when the trial judge granted Anders' motion for judgment of acquittal under Fed.R.Crim.P. 29. Thus, only Count One remained for jury consideration as to Anders. Anders was found guilty under Count One pursuant to a jury verdict.

answer which was forthcoming from Layton Champlin. Other than to note that the prosecutors or investigative agents should have warned Layton Champlin to avoid any reference to Anders' indictment and conviction, the error could probably be overcome by a curative instruction. It is apparent, however, that the prosecution team made no effort to warn prospective witnesses to avoid references to obviously inadmissible testimony. The prosecutors, for themselves, claim a lack of time, but the many agents for the various law enforcement agencies are fully capable of rendering this service to the prosecutors and thus assist in avoiding the errors occasioned by overly zealous prosecutors.

Incident No. 3 again involved Brenda Champlin when she continued the following morning on direct examination (R. 14-1182). Renewing the unnecessary and repetitious questioning of this witness as to the preparation of the partially fictitious tapes, prosecutor Segrest asked (R. 14-1189):

Q. Now, at that time on July the 24th, 1988, you have not been indicted, had you?

A. No, I hadn't.

Q. Did you know that you were even being investigated?

A. No, I didn't.

Q. Was anything said on that occasion in July of '88 or on July the 24th of '88, about you were under investigation?

A. No.

Q. What was said as to the reason for making this tape?

A. Because there had been an indictment before, which I was not involved in.

Q. Okay. Who said that—no, no. All I am asking you is whether anything was said to you about your being investigated?

A. No.

### (MOTION FOR MISTRIAL RENEWED AND OVERRULED)

When the motion for mistrial was renewed in the absence of the jury by counsel for Anders (R. 14-1204), the court directed an inquiry to the prosecutor, "I will hear from you as to what in the world you were doing." The prosecutor replied (R. 14-1204):

I am not charging her with a separate offense. I am charging that the person that perpetrated it with a lawyer present [Russell, the Tennessee attorney who did not represent either Champlin or Anders], a lawyer that didn't tell her that it might be a violation of law to do that. Now, I was not attempting to elicit anything about the Kentucky charges at all. There was a conversation that I understood about the fact that Karla was talking and an investigation was going on, and that's what I expected to seek, but the truth of the matter is, there was a lawyer present, with Bonnie—

THE COURT: Well, I had indicated very strongly that anything about another indictment shouldn't be brought out in this case.

MR. SEGREST: I understand.

THE COURT: I don't know whether that's what you had in mind or not.

MR. SEGREST: No, sir, it [sic] did not, and I don't have any idea of another indictment about that incident as far as this girl or anybody else right this minute. But what I am saying, it appears to me that—it appears to me we ought to be able to bring out just like every time De Franco testified and every time that—when Cornell testified, and anybody else testified to something that they are breaking the law, Mr. Bailey [attorney for Jerry Allen Lequire] can ask every time whether it's a violation of law to tap phones, whether it's a violation—

THE COURT: Nobody has objected to your asking whether it's a violation.

MR. SEGREST: That's what I thought the objection was to.

THE COURT: The lawyer is not on trial here.

MR. SEGREST: No, sir.

THE COURT: So that's not—I didn't see the relevancy of that, but what I am saying is—

MR. SEGREST: Well, the remark she made, which was unresponsive and surprising to me, was there had been anoth-

er indictment, there was an indictment in '83 and '84 against this—

THE COURT: I don't think—I did not think it was clear from her statement that she was talking about another indictment of Bonnie, but I am telling you to stay away from that, tell your witnesses to stay away from anything like that.

MR. SEGREST: Yes, sir.

It is apparent that the prosecutor had not, to this point in the trial, considered the issue of character evidence and the effect of calling to the attention of the jury an indictment unrelated to the case on trial.

Incident No. 4 took place while Karla Espinal, the principal witness for the prosecution was testifying (R. 14–1342–43). Prosecutor Segrest inquired as to what Anders did for Jerry Allen LeQuire, to which question Karla Espinal replied, "She tapped phones." Then follows:

Q. Okay. Now, did you ever discuss with Bonnie Sue Anders what her background was that would give her any expertise or facility to tap phones?

A. Yeah, she worked for the phone company as a telephone repairman until she got fired when she got convicted on—

Q. No, she got fired, right?

A. Right.

### (MOTION FOR MISTRIAL)

At the conclusion of that day's proceedings, in the absence of the jury, the argument on the mistrial motion was renewed, with the court again directing the prosecutor to instruct his witnesses to avoid any mention of a "conviction or anything else," and the prosecutor pleading lack of time to attend to this detail. While the court made no express ruling, it is apparent that the motion for mistrial was denied as the court gave a curative instruction (R. 15–1387) to the jury.

The fifth and final incident with respect to the admission of evidence was Karla LeQuire's testimony as to her actions with respect to cocaine in 1986. She had testified that she had been getting her cocaine from Alvaro Palaez (R. 15–1466) but, not satisfied with that answer, Prosecutor Segrest inquired:

Q. Did you also deal with anyone else?

A. In the beginning, in 1986, when I started selling cocaine, it was—Bonnie and myself got into a business together to sell the cocaine.

MR. FUGATE: Your Honor, I have a motion at the appropriate time.

\*     \*     \*     \*     \*     \*

### (IN CHAMBERS)

Prosecutor Segrest then stated that he expected Karla LeQuire to answer Hector Ramirez, and further said that he had warned the witness (R. 15–1467). The ridiculous part of this scenario is that, under any theory of extended conspiracy, such a conspiracy involving drugs had ended. Jerry LeQuire was arrested in August 1983 and, even with the planned escapes from the penal system, the conspiracy cannot continue forever. Bonnie Sue Anders was not charged with engaging in the drug business with Karla LeQuire in 1986, and Prosecutor Segrest's explanation that he was expecting a different name to be given is frivolous. Even Segrest admitted that the question to the witness was "too broad" (R. 15–1469).

While the court gave another curative instruction to disregard the cocaine offense as stated by the witness (R. 15–1472), together with her entire answer, there can be no doubt that the character and past criminal offenses of Bonnie Sue Anders had been sufficiently planted in the minds of all the jurors to place her along with Jerry LeQuire in the illegal drug business. The able district judge repeatedly warned Prosecutor Segrest that a new trial would be forthcoming if he persisted. While Segrest professes ignorance and lack of any wrongful intention in his four instances of misconduct, the nature and persistence of his violations of the fundamental rule, embodied in Federal Rule of Evidence 404, that "the government may not rely on the accused's bad character to win a conviction unless character has been put in issue by the defense," *United States v. Rodriguez,* 765 F.2d 1546 (11th Cir.1985), strongly suggest otherwise. When the additional violation of Rule 404 by another member of the prosecution team is also

considered, there can be but one conclusion: the prosecutorial misconduct complained of in this case was so substantial as to permeate the overall fairness of Anders' trial.

The government contends that the curative instructions given by the trial court with regard to each instance of misconduct sufficiently protect Anders' rights (Brief of Appellee at 59). While it is true that instructions from the bench can cure isolated instances of prosecutorial misconduct, there are some matters that cannot be removed by curative instructions; five instances reflecting on the character of Anders is more than enough to fall into the latter category. *See United States v. Reed,* 887 F.2d 1398, 1402 (11th Cir.1989) (instruction cured single instance of prosecutorial misconduct where "... the trial judge immediately issued a curative instruction and the *prosecutor thereafter desisted from any such remarks or references*") (emphasis added); *United States v. Nickerson,* 669 F.2d 1016, 1020 (5th Cir. Unit B 1982) ("[a]lthough in the instant case the prosecutor clearly acted improperly, *it was an isolated instance* which could be cured by such an instruction") (emphasis added). *See also United States v. Griggs,* 735 F.2d 1318, 1324 n. 3 (11th Cir.1984) ("We caution, however, that, although individually, each comment may stem from a proper motive, in excessive cases, the sheer volume of such comments may warrant a finding of bad motive."); *United States v. Barshov,* 733 F.2d 842, 847 (11th Cir.1984), *cert. denied,* 469 U.S. 1158, 105 S.Ct. 904, 83 L.Ed.2d 919 (1985) (prosecutor's reference in his summation to "other people" was cured by district court's instructions to jury); *United States v. Drum,* 733 F.2d 1503, 1509 (11th Cir.), *cert. denied,* 469 U.S. 1061, 105 S.Ct. 543, 83 L.Ed.2d 431 (1984) (where defendant was acquitted on one of two charges before jury, the fact that nine objections to the prosecutor's rebuttal argument were sustained does not indicate that the prosecutor's statements had a prejudicial effect on the outcome of the case); and *United States v. Siegel,* 587 F.2d 721, 727 (5th Cir.1979) (prosecutor's improper statement in closing arguments

was cured by district court's jury instructions).

Although any single instance of prosecutorial misconduct with regard to Anders may have escaped reversal, we are convinced that the sum of the errors in the case of Bonnie Sue Anders denied her the fair and impartial trial that she is entitled to under the law. Accordingly, we reverse and remand the case against appellant Anders for a new trial.

### D. *James Thomas LeQuire*

■ Appellant James Lequire argues that the failure of the district court to grant a mistrial when the prosecutor brought out a prior conviction, despite a prior court order that the conviction could not be used for impeachment, was reversible error. We disagree and affirm the district court's ruling.

Prior to the trial, appellant submitted a motion *in limine* requesting that the prosecution refrain from making any references to his prior felony conviction since the conviction was untimely under Rule 609(b) of the Federal Rules of Evidence. This motion was granted. During trial, James LeQuire took the stand to testify on his own behalf. In direct contravention of the court's order, the prosecutor asked a question concerning the prior conviction. The defense counsel objected immediately and moved for a mistrial.

After denying the motion, the court gave the following curative instruction:

When the last recess was called, the question had been asked about some offense that Mr. LeQuire had committed. The offense that he was talking about, the Court had already ruled it was a very trivial offense and it happened over twenty years ago and it was not admissible for any purpose. And so although there was no answer to the question, the question shouldn't have been asked in view of the ruling of the Court about the totally irrelevant relevance of some minor offense that occurred more than twenty years ago, so you are to just disregard the question.

(R. 18–2176). In *United States v. Rodriguez,* 765 F.2d 1546, 1559–60 (11th Cir.

1985), this court noted that "our task is to determine the probable effect the improper comment had on the jury." In James LeQuire's case, any prejudice imparted on the jury by this single improper prosecutorial comment was removed by the comprehensive curative instruction given immediately thereafter. Consequently, such instruction was sufficient to render harmless any error caused by this misconduct. *United States v. Reed,* 887 F.2d 1398, 1402 (11th Cir. 1989), *cert. denied,* 493 U.S. 1080, 110 S.Ct. 1136, 107 L.Ed.2d 1041 (1990). We, therefore, affirm the district court's denial of mistrial under these circumstances.

### CONCLUSION

For the reasons enumerated in this opinion, we REVERSE and REMAND the conviction of Bonnie Sue Anders because of prosecutorial misconduct which denied her a fair trial. The convictions of Jerry LeQuire, James LeQuire, Charles LeQuire, Robert LeQuire, Harold Ward and Michael Jenkins are AFFIRMED.[23]

AFFIRMED in part, REVERSED in part, and REMANDED.

---

**23.** We have considered the appellants' other arguments but reject them as meritless. Thus, we affirm the district court's findings in all regards on these issues.